**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**JANE ZOE,**
  FMC Carswell
  1200 MEANDERING ROAD
  FORT WORTH, TX 76114
                    *Plaintiff*,

v.

**UNITED STATES OF AMERICA,**
  SERVE:
  Federal Tort Claims Act Section
  Tort Branch, Civil Division
  U.S. Department of Justice
  950 Pennsylvania Ave. NW
  Washington, DC 20530-0001

  U.S. Attorney's Office
  Civil Process Clerk
  555 Fourth St. NW
  Washington, DC 20530

  U.S. Attorney General Bondi
  U.S. Department of Justice
  950 Pennsylvania Ave. NW
  Washington, DC 20530-0001

 and

**BETH REESE, in her individual capacity,**
  Bureau of Prisons
  Central Office HQ
  320 First Street, NW
  Washington, DC  20534

                    *Defendants*.

Civil Action No.

**COMPLAINT**

**INTRODUCTION**

1.      In 2020, Jane Zoe[1] entered the Federal Bureau of Prisons (hereinafter "BOP") knowing she would be required to serve her term of imprisonment.  However, she did not imagine that during her sentence, she would be groomed, manipulated, controlled, and sexually assaulted by the prison therapist, Dr. Benjamin Quick (hereinafter "Dr. Quick" or "Quick"), who knew of her vulnerabilities and was entrusted with providing her mental health care while acting within the course and scope of his employment.  She also did not imagine that she would then be sexually abused by the Chaplain and that BOP would once again take no action to protect her from ongoing abuse and retaliation or the harm caused by the abuse.

2.      Ms. Zoe has autism spectrum disorder and severe Anorexia Nervosa, resulting in frequent hospitalizations, and regular therapy sessions were necessary for her survival.  BOP is aware of these conditions and her treatment needs.

3.      Due to failures throughout the chain of command of the BOP, especially at the Office of Internal Affairs which failed to adequately investigate Plaintiff's multiple reports of sexual assault and retaliation, sexual predators have been free to prey upon incarcerated women whose safety they were tasked to ensure, including both Plaintiff's assigned therapist, Dr. Quick, and Chaplain Farid Farooqi (hereinafter "Chaplain Farooqi"), both still employed by BOP.

4.      The BOP leadership, including Ms. Reese, have been aware of the culture of sexual abuse throughout the agency and specifically at FMC Carswell—where people in their care had been reporting sexual abuse by officers and other staff for years—and yet did nothing to meaningfully respond or otherwise protect the people incarcerated there.

---

[1] Plaintiff is proceeding under a pseudonym to protect her privacy.

[4692468.5]

5.    As a direct result of these failures, Ms. Zoe, an already vulnerable woman, was targeted by a sexual predator who knew of her triggers and mental health needs, while he sexually assaulted her for over a year, and then retaliated against her when she came forward and filed a report.

6.    These failures by the BOP also resulted in Ms. Zoe being targeted again by the Chaplain in the guise of providing her religious services.  She reported his abuse and was subsequently retaliated against including being placed in the SHU on multiple occasions.

7.    She continues to suffer retaliation from BOP staff through today.

8.    Ms. Zoe suffers from ongoing trauma because of the sexual abuse and retaliation she suffered, as well as the flagrant abuse of power by therapist, Dr. Quick, and his failure to provide medically necessary and required treatment for her severe mental health needs.  She has chronic nightmares, anxiety, and depression.  She remains in the custody of the BOP and fears continual assault by those responsible for her care.  She is afraid to access mental health and religious supports due to the abuse and failure of BOP to protect her.

9.    Plaintiff brings this suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et seq.*, in connection with the deficient supervision and custodial care provided to her by various personnel, including Dr. Quick and Chaplain Farooqi, and the Officer of Internal Affairs, within the scope of their employment with the BOP.  Plaintiff seeks redress for Defendants' unlawful conduct, which caused her to suffer permanent and catastrophic injuries.

**JURISDICTION AND VENUE**

10.    This action involves claims arising under United States and District of Columbia laws.  Plaintiff's claims are predicated, in part, upon the FTCA, 28 U.S.C. §§ 2671, *et seq.*, authorizing actions seeking relief against the United States.  The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1346(b)(1), 1367, and 1343(a)(4).

3

[4692468.5]

11.     Venue is proper in this district under 28 U.S.C. § 1391 because acts or omissions giving rise to the claims occurred in this district, and under 28 U.S.C. § 1391(3) because the individual Defendant is subject to this Court's personal jurisdiction.

**PARTIES**

12.     The Plaintiff, Jane Zoe, was at all times relevant here incarcerated in BOP facilities, including FMC Carswell, located at 1200 Meandering Road, Fort Worth, Texas 76114, where she remains today.

13.     The Defendant United States of America ("United States") is liable for the tortious acts of its employees in accordance with the FTCA and is the appropriate Defendant for Plaintiff's claims under the FTCA.  The United States is a sovereign entity that has waived immunity for certain claims, including the claims set forth herein, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur with the scope of their employment.

14.     The BOP is a component of Defendant United States of America's Department of Justice.  The BOP operates and is in possession and control of the Federal Medical Center Carswell ("FMC Carswell").  FMC Carswell is a federal female medical correctional institution providing special medical and mental health needs.

15.     At all times relevant hereto, Defendant United States acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all BOP matters including at FMC Carswell and responsible for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel, including but not limited to Dr. Quick, Chaplain Farooqi, and Defendant Reese and the operation of the Office of Internal Affairs which is responsible for investigating staff misconduct.

16.     Defendant Beth Reese is Chief of the Office of Internal Affairs for the BOP.

4

[4692468.5]

17.    She has held that role since May 2018.

18.    Her duty station is in the Central Office in Washington, DC.

19.    As chief of the Office of Internal Affairs, Ms. Reese is responsible for overseeing and properly responding to allegations of staff misconduct.

20.    She has responsibilities for ensuring that investigations conducted by her office move forward and are completed in a timely manner.

21.    These responsibilities include, but are not limited to, training and policy development regarding the office's handling of sexual misconduct allegations, reviewing retaliation allegations and determining whether to have a local investigator or someone from the Central Office further review the matter, reviewing local allegations and referring it to the appropriate local OIG field office, and tracking and maintaining awareness of investigations handled by the OIG.[2]

22.    While acting and failing to act as alleged herein, Defendants had complete custody and total control of Plaintiff.

23.    Plaintiff was dependent upon Defendants for her personal security and necessities.

24.    In performing the acts and/or omissions contained herein, Defendants, and each of its employees, acted under color of federal law, each acted maliciously, callously, intentionally, recklessly, with gross negligence, and with deliberate indifference to the rights and personal security of Plaintiff.  Each of them knew or should have known that their conduct, attitudes, actions, and omissions were, and are, a threat to Plaintiff and to her constitutionally, statutorily,

---

[2] Transcript of Evidentiary Hr'g at 25, 28, 37, 59, 61, *Cal. Coal. for Women Prisoners v. United States of America Fed. Bureau of Prisons*, (2024) (No. CV 23-04155-YGR).

[4692468.5]

and common law protected rights.  Despite this knowledge, Defendants failed to take steps to protect Plaintiff and to ensure her rights to safety from sexual assault.

25.     Defendants are liable for the tortious acts of its employees as well as the negligent failure to properly investigate.  At all times relevant hereto, each Defendant was the agent, representative, or employee of each other Defendant.  At all times relevant hereto, each Defendant, as well as Dr. Quick and Chaplain Farooqi, was acting within the course and scope of said alternative agency, representation, or employment and was within the scope of their authority, whether actual or apparent.  At all times relevant hereto, each Defendant was the authorized agent, partner, servant or contract of each other Defendant, and the acts and omissions herein alleged were done by them acting through such capacity, within the scope of their authority, with the permission, ratification, approval, and consent of the United States and Defendant Reese.  Accordingly, each of them is jointly and severally liable to Plaintiff.

## STATEMENT OF FACTS

### THERE IS A LONG-STANDING HISTORY OF SEXUAL ABUSE AT FMC CARSWELL AND THROUGHOUT THE BOP

26.     Sexual abuse by correctional officers and other prison staff at BOP facilities in the United States has been documented for decades.

27.     In 1999, Amnesty International published a report titled "*Not part of my sentence: Violations of the human rights of women in custody.*"

28.     That Amnesty Report detailed:

Many women in prisons and jails in the USA are victims of sexual

abuse by staff, including sexually offensive language; male staff

6

[4692468.5]

touching inmates' breasts and genitals when conducting searches;

male staff watching inmates while they are naked; and rape.[3]

29.     The Amnesty Report was widely circulated and read by responsible corrections professionals.

30.     FMC Carswell is the only federal all-female medical prison in the United States and houses prisoners requiring more intensive medical and mental health care.

31.     Any prisoner identified as care level 3 or 4, the two highest care levels, will be automatically transferred to FMC Carswell.

32.     From 2014 to 2018, 35 women at the FMC Carswell reported sexual abuse from staff members.  This number was the highest rate of reported sexual abuse of any federal women's prison, until recent news about FCI Dublin, the federal prison infamously referred to as the "rape club."[4]

33.     The Amnesty Report found that FMC Carswell "has been plagued with systemic sexual abuse for years," revealing hundreds of pages of incident reports, federal records, and court documents documenting a pattern of sexual misconduct and cover-ups.

34.     The true number of assaults that occurred over this period at FMC Carswell is likely worse than records indicate because many prisoners don't report sexual assaults for fear of retaliation.

35.     Since 1997, at least 12 correctional staff at FMC Carswell have been convicted of sexual abuse that occurred while at FMC Carswell.

---

[3] Amnesty International, *Not part of my sentence: Violations of the human rights of women in custody,* available at https://www.amnesty.org/en/documents/amr51/001/1999/en/.

[4] Kaley Johnson, *Fort Worth Carswell women's prison plagued by sexual abuse, cover ups,* Star-Telegram, Sept. 2, 2022, https://www.star-telegram.com/news/local/crime/article264613401.html.

[4692468.5]

36.    Two lawsuits were filed by two women related to the 2021 repeated sexual assaults by recreation specialist Marerllis Nix, who was a known sexual predator.

37.    FMC Carswell staff witnessed Nix take women to isolated areas of the prison, outside the view of cameras, but failed to intervene.[5]

38.    In 2004, FMC Carswell officer Michael Lawrence Miller was found guilty of 5 counts of assault, abusive sexual contact with a ward, abusive sexual contact, sexual abuse of a ward, and aggravated sexual abuse.[6]

39.    In 2008, an FMC Carswell chaplain was sentenced to four years in prison for sexually abusing women in his custody.[7]

40.    One woman reported abuses that occurred in 2011, 2012, 2015, 2017, and 2018. These abuses included rape committed by two federal officers, who also beat her unconscious and attacked her with a burning liquid after she reported the rape.[8]

41.    From 2012 to 2021, the BOP Office of Internal Affairs substantiated at least 16 cases of BOP staff sexually abusing women incarcerated at FMC Carswell, almost all before Dr. Quick raped Plaintiff.[9]

---

[5] Megan Cardona, *Sexual abuse a 'severe problem' at Fort Worth's Carswell prison, attorneys for 2 women say*, KERA News, Mar. 11, 2024, https://www.keranews.org/criminal-justice/2024-03-11/fort-worth-carswell-sexual-abuse-federal-prison-2-victims.

[6] Michael Rigby, Sexual Predation Rampant at FMC-Carswell; Another Employee Convicted, Prison Legal News, May 15, 2007, https://www.prisonlegalnews.org/news/2007/may/15/sexual-predation-rampant-at-fmc-carswell-another-employee-convicted/.

[7] *Priest Who Sexually Abused Inmates at FMC Carswell in Fort Worth Sentenced to 4 Years in Federal Prison,* US DOJ OIG, May 5, 2008, https://oig.justice.gov/sites/default/files/2020-05/2008-05-05.pdf.

[8] Kaley Johnson, *Pakistani prisoner beaten and sexually assaulted in Fort Worth federal prison, lawsuit says*, KERA NEWS, Sept. 25, 2024, https://www.keranews.org/criminal-justice/2024-09-25/aafia-siddiqui-carswell-pakistani-prisoner-sexual-assault-fort-worth-federal-prison-lawsuit.

[9] *Sexual Abuse of Female Inmates in Federal Prison*, United States Senate, Dec. 13, 2022, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-

[4692468.5]

42.     In 2016, BOP employee Matthew McGaugh began sexually abusing an incarcerated woman under his custody.  She reported him, but faced constant retaliation.  He was convicted in 2017.[10]

43.     In 2021, Lieutenant Luis Curiel sexually abused three women.  He was reported in June or July 2021 by another staff member, yet was allowed to remain working at FMC Carswell, where he continued sexually assaulting prisoners.  He pled guilty to two counts of sexual abuse and admitted in the criminal prosecution that he had sexually abused three women under his custody at FMC Carswell.[11]

44.     A BOP staff member who worked at FMC Carswell described the prison as "the perfect place for sexual misconduct," but remained anonymous for fear of retaliation.  This same officer had previously reported a lieutenant for exchanging drugs for sex, and was subsequently retaliated against and fired.[12]

45.     In the PREA Audit Report at FMC Carswell conducted in the beginning of 2022, it was noted that in just the previous 12 months, 9 officers were referred for criminal prosecution for sexually assaulting a prisoner.[13]

46.     Despite the audits, lawsuits, and criminal referrals, the abuse has continued and Defendants failed to take appropriate action to prevent future abuse, such as that experienced by

---

13%20PSI%20Staff%20Report%20-
%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf

[10] *Former BOP Employee Sentenced for Engaging in Sexual Acts with Inmate*, USAO Press Release, Nov. 7, 2017, https://www.justice.gov/usao-ndtx/pr/former-bop-employee-sentenced-engaging-sexual-acts-inmate.

[11] *See United States v. Luis Curiel*, 4-22-cr-00132 (N.D.T.X) 2022.

[12] *See*, supra, 4.

[13] Robert Palmquist, Prison Rape Elimination Act Audit Report, Apr. 6, 2022, https://www.bop.gov/locations/institutions/crw/crw_prea.pdf.

[4692468.5]

Plaintiff, and continued to allow male staff to spend a significant amount of time alone and unsupervised with incarcerated women at FMC Carswell.[14]

47.    Sexual abuse by staff at BOP women's prisons has not been limited to FMC Carswell and is well documented throughout BOP facilities across the country.

48.    In 2007, five former corrections officers were convicted on criminal charges relating to the sexual abuse of female prisoners at FCI Tallahassee.

49.    A 2021 lawsuit filed by four plaintiffs revealed sexual abuse by an FCI Tallahassee physician assistant.[15]  Prior to this action, the same physician assistant was named in at least four civil suits alleging sexual abuse.[16]  Another former corrections officer at FCI Tallahassee received a two-year prison sentence for the sexual abuse of a prisoner in August of 2021.[17]  The victim in that case also filed a civil lawsuit, which named a second FCI Tallahassee guard accused of abuse, which settled in 2022.[18]

50.    In 2022, a different former corrections officer at FCI Tallahassee was sentenced to prison for four years for the sexual abuse of a prisoner while working at the facility and the indictment included charges related to multiple prisoners.[19]

---

[14] Undersigned counsel currently represents an additional five women who have alleged sexual assault by different officers and staff at FMC Carswell.

[15] Compl. at 1, *Batchelor et al v. Rolston et al*, No. 4:21-cv-00232-AW-MAF (N.D. Fla. June 4, 2021).

[16] *Id*.

[17] Press Release, United States Attorney's Office for the Northern District of Florida, Former Bureau of Prisons Correctional Officer Sentenced to 24 Months in Federal Prison For Sexually Abusing Inmates (Aug. 27, 2021), https://www.justice.gov/usao-ndfl/pr/former-bureau-prisons-correctional-officer-sentenced-24-months-federal-prison-sexually.

[18] Silja Talvia, *Women Report 'Rampant' Sexual Abuse at Federal Prison Where Ghislaine Maxwell is Held,* THE APPEAL, Apr. 25, 2023, https://theappeal.org/fci-tallahassee-sexual-abuse-women-prison-ghislaine-maxwell/.

[19] Christopher Cann, *Former Tallahassee correctional officer sentenced to 4 years in prison for sexually abusing inmate*, TALLAHASSEE DEMOCRAT, Mar. 11, 2022,

[4692468.5]

51.    In July 2022, a DOJ working group was tasked to address "reported and proven sexual misconduct by Federal Bureau of Prisons ("BOP") employees" by reviewing the DOJ's approach to monitoring and deterring employee sexual misconduct.[20]

52.    The working group noted long-standing, pervasive problems throughout the BOP. The working group also learned of long-standing insufficient reporting mechanisms, "flawed investigations," and examples of "inadequate administrative sanctions and initial prosecutorial declinations for employees ultimately convicted of egregious misconduct."[21]

53.    The working group found that "advocates and formerly incarcerated women identified several obstacles to reporting sexual abuse, including a fear of not being believed, a fear of retaliation, and a fear that reporting would not result in consequences for the perpetrator."

54.    The working group found that "formerly incarcerated individuals reported that corrections officers have threatened retaliation against reporting individuals, including by restricting access to children."

55.    One particular problem it found was that, until the early 2020s, "SIS officers were encouraged during initial intake interviews to obtain from victims sworn declarations in writing under penalty of perjury, presumably for a later administrative investigation."

56.    This practice was a problem because "There is no legal requirement for sworn statements or affidavits, and the evidentiary value of these sworn affidavits may be limited.  At

---

https://www.tallahassee.com/story/news/2022/03/11/former-tallahassee-correctional-officer-sentenced-4-years-prison-for-abusing-inmate-leon-county/6984207001/.

[20] The Principal Associate Deputy Attorney General Working Group of DOJ Components, *Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons*, Nov. 2, 2022, https://www.justice.gov/d9/pages/attachments/2022/11/03/2022.11.02_bop_sexual_misconduct_working_group_report.pdf.

[21] *Id*.

[4692468.5]

the same time, requiring such sworn statements run counter to trauma-informed practices and may chill reporting, as it heightens a victim's fear that she may face prosecution if her account is not believed."

57.    Finally, the working group noted the problems created by blind spots in many women's prisons and suggested that the "BOP should continue to upgrade camera technology and implementation and, beginning with female institutions, review and expand coverage of currently deployed cameras across BOP systems to eliminate 'blind spots.'"[22]

58.    The working group also issued elementary guidance regarding establishing an appropriate tone about sexual misconduct at BOP facilities: "The Director of BOP should issue a message reiterating the gravity of sexual misconduct and expressing that sexual misconduct will not be tolerated."[23]

59.    The implication of this guidance given the ongoing, rampant abuse within BOP, is that this message had not been communicated to BOP staff.

60.    An investigation by the Associated Press published in 2021 unfolded that over a hundred federal prison workers had been convicted or arrested for crimes since 2019, including a drug treatment specialist at Kentucky prison medical center who threatened prisoners' lives if they did not comply with sexual abuse.[24]

---

[22] *Id.*

[23] *Id.*

[24] Michael Balsamo, *Workers at federal prisons are committing some of the crimes*, TORONTO STAR, Nov. 14, 2021, https://www.thestar.com/news/world/united-states/workers-at-federal-prisons-are-committing-some-of-the-crimes/article_e52cd284-d095-5caa-8e5f-90173c580ffd.html.

[4692468.5]

61.    The AP reporting also uncovered the Justice Department's failure to adhere to standard practice by not removing or suspending a prison official tasked with investigating staff misconduct, who was the subject of complaints and arrests himself.[25]

62.    In October 2022, the DOJ Office of the Inspector General issued a report detailing its concerns over how the BOP had been handling of administrative misconduct investigations and prisoner statements relevant to those investigations.[26]

63.    The OIG specifically noted that "The BOP's reluctance to rely on evidence provided by inmates enhances the likelihood that employees who have engaged in misconduct avoid accountability for their actions and remain on staff, thereby posing serious insider threat potential, including the risk of serious harm to inmates." [27]

64.    The OIG further noted that the BOP's procedures had historically created a problem because "to the extent that the BOP's reluctance to rely on inmate testimony is known to its employees, this reluctance likely emboldens miscreant staff members in their interactions with inmates because such staff members may act without fear of disciplinary consequences." [28]

65.    The report explained that the "OIG has serious concerns that that the BOP is reluctant to rely on inmate testimony in administrative misconduct investigations, has a general practice of avoiding calling inmates as witnesses in MSPB and arbitration proceedings, and, at least in matters involving staff on inmate sexual assault, is effectively requiring significantly

---

[25] *Id.*

[26] Michael E. Horowitz, *Management Advisory Memorandum: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees*, Oct. 2022, https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

[27] *Id.*

[28] *Id.*

[4692468.5]

more proof than necessary under the applicable preponderance of the evidence standard to sustain misconduct and take disciplinary action against BOP employees." [29]

66.    In sum "The OIG concluded that this manner of handling misconduct by BOP employees is contrary to federal regulations and BOP policy and creates significant risks for the BOP."[30]

67.    Over the last two years, more history of sexual abuse in the BOP has come to light.

68.    A 2023 indictment involved the sexual abuse of two prisoners from 2018 through 2019 at Federal Correctional Institution Aliceville, perpetrated by a federal correctional officer.[31]

69.    In 2022, a jury convicted a former prison warden at another federal facility afflicted by allegations of abuse, FCI Dublin, of sexually abusing three prisoners from 2019 through 2021 and of making false statements to a government agency in the investigation of criminal acts.  Separate from the warden's own sexually abusive behavior, eight FCI Dublin correctional officers were charged with abusing prisoners during this warden's tenure.[32]

70.    In 2024, a Special Master Report stemming from litigation surrounding sexual abuse at FCI Dublin unearthed a series of deficiencies at the California facility, some of which

---

[29] *Id.*

[30] Michael E. Horowitz, *Management Advisory Memorandum: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees*, Oct. 2022, https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

[31] Press Release, U.S. Dept. of Justice, Office of the Inspector General, *BOP Correctional Officer Indicted for Sexual Abuse of Inmates*, Apr. 24, 2023, https://oig.justice.gov/news/press-release/bop-correctional-officer-indicted-sexual-abuse-inmates.

[32] *Press Release, Office of Public Affairs, U.S. Dept. of Justice, Former Federal Prison Warden Sentenced for Sexual Abuse of Three Female Inmates, Mar. 22, 2023, https://www.justice.gov/opa/pr/former-federal-prison-warden-sentenced-sexual-abuse-three-female-inmates.*

[4692468.5]

"are likely an indication of systemwide issues within the BOP, rather than simply within FCI-Dublin."[33]

71.    Among the report's findings detailing the failures of the central BOP office including "the failure of Central Office and Regional Office management to correct significant and longstanding deficiencies that had previously been idenfied [sic] in multiple audits and investigations."[34]

72.    The Special Master also found that "Furthermore, management's failure to ensure staff adhered to BOP policy put the health, safety and liberty of AICs [adults in custody] at great risk for many years."[35]

73.    The Special Master noted that the BOP had understaffed and given low priority to Women and Special Populations Branch.[36]

74.    The Special Master found that the "Female Offender Program Statement is outdated and does not reflect state-of-the-art knowledge on managing female AIC populations."[37]

75.    The Special Master also reported that the BOP had "no standard protocol to report violations."[38]

---

[33] Wendy Still, *First Report of the Special Master Pursuant to the Court's Order of March 26, 2024*, June 5, 2024, https://static1.squarespace.com/static/64a5d4d138199b2c7c48c3de/t/66d361045918c670b861f4af/1725128967464/FCI+Dublin%2C+Special+Master+Report+%28No+Attachments%29.pdf.

[34] *Id*.

[35] *Id*.

[36] *Id*.

[37] *Id*.

[38] *Id*.

[4692468.5]

76.    The Special Master also found that the "BOP does not use PREA or other data to monitor reports of assault."[39]

77.    Defendants took no meaningful action to address the culture, physical plant, or supervision at FMC Carswell.

78.    In short, the long history of Defendants' mismanagement created the conditions that led directly to Ms. Zoe being targeted and repeatedly sexually assaulted by a BOP staff member.

## BOP STAFF EXPLOITED MS. ZOE'S VULNERABILITY DUE TO HER MENTAL AND MEDICAL HEALTH TO ABUSE HER

79.    Plaintiff was diagnosed with Autism Spectrum Disorder (ASD, formerly known as Aspergers syndrome) in childhood,

80.    ASD is a neurological and developmental disorder that impacts how a person communicates, learns, interacts with others, and behaves.

81.    People with ASD may have difficulty with social communication and interacting with other people, restricted and repetitive behaviors, and other symptoms that affect their ability to function in day-to-day life.[40]

82.    As a result of her ASD, Plaintiff gets overwhelmed and disoriented by television noise, flashing lights, and other sounds and noises.

83.    Plaintiff needs consistency and a daily routine and becomes agitated and disoriented with sudden or unexpected changes in her routines.

84.    Because of her sensitivity to textures, changes, and inconsistency, Plaintiff wears the same old torn clothing because it provides her with a sense of safety.

---

[39] *Id*.

[40] https://www.nimh.nih.gov/health/publications/autism-spectrum-disorder.

[4692468.5]

85.    Plaintiff has trouble connecting with other people or socializing and has often been characterized as "cold."

86.    Additionally, Plaintiff is especially sensitive to texture, smell, consistency, and appearance of foods.

87.    Plaintiff never grew up being able to eat food around family members or other people, a challenge that continued to persist in prison.  As a result, Ms. Zoe has consistently requested a single cell.

88.    In addition to ASD, Plaintiff has suffered from Anorexia Nervosa (Anorexia) since her teenage years.

89.    Anorexia is an eating disorder in which someone restricts the number of calories they consume resulting in mental, behavioral, and physical symptoms.  Because of the deficit of nutrients and calories, anorexia can result in life-threatening complications.[41]  Plaintiff's history of anorexia has become life-threatening.

90.    Incarceration has further exacerbated Plaintiff's anorexia.  In 2020, when she entered the BOP, Ms. Zoe weighed 58 pounds and had a Body Mass Index (BMI) of less than 11. It has been difficult for Ms. Zoe to maintain a healthy weight while incarcerated and she has had frequent relapses in her anorexia.

91.    Plaintiff's medical records note that she is consistently severely malnourished and severely underweight.

---

[41] Cleveland Clinic, Anorexia Nervosa, (Aug. 9, 2024), accessible at https://my.clevelandclinic.org/health/diseases/9794-anorexia-nervosa.

[4692468.5]

92.     As a result of her anorexia, Plaintiff has developed additional serious medical conditions, including worsening conditions of Gastroesophageal reflux disease (GERD), hypotension, weakened muscles and bones, and heart palpitations.

93.     Furthermore, because of her low weight and corresponding muscle and bone weakness, Ms. Zoe has sporadically been confined to a wheelchair, unable to bear her own body weight.

94.     Plaintiff's anorexia, which Dr. Quick knew she was suffering from, made her more vulnerable to abuse.

95.     Eating disorders are a form of mental illness, to which the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) devoted an entire chapter.[42]

96.     The Academy for Eating Disorders considers anorexia nervosa and bulimia nervosa as well as their variants to be "biologically based, serious mental illnesses (BBMI) that warrant the same level and breadth of health care coverage as conditions currently categorized in this way (*e.g.*, schizophrenia, bipolar disorder, depression, obsessive-compulsive disorder)."[43]

97.     BBMIs impair judgment, cognitive function, and emotional stability.[44]

98.     As her treating psychologist, Dr. Quick knew the mental health implications of Plaintiff's serious anorexia when he abused her.

99.     Her mental health diagnoses have created additional struggles with staff and prisoners in the prison setting.

---

[42] DSM-IV at 539-550.  The more recent DSM-5-TR includes Anorexia Nervosa and Bulimia Nervosa in the overall chapter on Feeding and Eating Disorders.  DSM-5-TR at 381-392.

[43] Klump et al., *Academy for Eating Disorders Position Paper: Eating Disorders Are Serious Mental Illnesses*, 42:2 International Journal of Eating Disorders 97-103, 97 (2009) accessible at https://evelyntribole.com/wp-content/uploads/AED-Eating-Disordrs.Mental-Illness.pdf.

[44] *Id.* at 98.

[4692468.5]

100.    She is regularly bullied by staff and other prisoners, who mock her for the difficulty she has socializing, the repeated rituals she must perform, as well as the avoidance of aversive triggers and other coping mechanisms she uses.

101.    As a result of Ms. Zoe's mental health diagnoses, anorexia, and the related-bullying, Ms. Zoe has been isolated since her incarceration and is particularly vulnerable.

## FMC CARSWELL AND THE ONGOING ASSAULT ON MS. ZOE

102.    Plaintiff entered the BOP in November 2020 and was immediately transferred to FMC Carswell because of her mental health and medical needs.

103.    Upon arrival, she was identified as medical care level 4, which is the highest care level, and mental health care level 3.

104.    Plaintiff began seeing Benjamin Quick, PhD, the therapist assigned to work with her in November 2020.

105.    Prisoners identified as mental health care level 3 are required to see a therapist at least once a week.

106.    Between November 2020 and December 2021, when Ms. Zoe was identified as mental health care level 3, she saw Dr. Quick twice a week.

107.    Because Dr. Quick was her therapist, Plaintiff confided in him and began trusting him.

108.    While she felt ostracized by other prisoners and staff, she felt that Dr. Quick was the one person on whom she could rely.

109.    Around November 2021, Plaintiff's mental health had improved and she was downgraded to mental health care and medical care level 2.

[4692468.5]

110.    In early December 2021, she was subsequently transferred from FMC Carswell, where she spent some time at the Oklahoma Transfer Center before being transferred to FCI Waseca.

111.    In March 2022, however, Plaintiff had an anorexia relapse and her mental health care level was raised to 3 and medical care level was raised to 4.

112.    She was sent back to FMC Carswell and arrived back at FMC Carswell on March 17, 2022.

113.    Plaintiff began seeing Dr. Quick again towards the end of March 2022.

114.    Because she was again mental health care level 3, Ms. Zoe saw Dr. Quick once or twice a week.

115.    Up until this point, Plaintiff and Dr. Quick had a purely professional relationship, where Ms. Zoe was Dr. Quick's patient.

116.    On April 25, 2022, Plaintiff's birthday, Dr. Quick sought Ms. Zoe out in the computer room to wish her a happy birthday.

117.    He then proceeded to walk Ms. Zoe back to her cell in Nursing Care Center 1, where she would regularly have therapy sessions with him.

118.    He entered Ms. Zoe's cell and then proceeded to kiss her on her mouth.

119.    She began crying, and he pulled her close and began stroking her neck, hair, and back.

120.    He knew that these actions were all soothing methods particularly calming for individuals with ASD, and for Ms. Zoe especially.

[4692468.5]

121. He then left the room. Ms. Zoe felt ashamed and confused by this, while she wanted Dr. Quick's support, she knew this was inappropriate and tried to tell herself it was a one-time thing.

122. The following week Dr. Quick saw her again and she asked him not to kiss her again. He responded "Okay, but did you like it? I could tell from your face that you liked it. Tell me the truth." Ms. Zoe responded that she is married and a prisoner to which Dr. Quick responded "You are not with your husband now. I don't want you to be in the prison but I would have never met you if you did not come to the prison." Ms. Zoe said she would tell people if it happened again to which Dr. Quick responded, "If you try no one will believe you. Look at how you have been framed. Nobody will believe what you say. You will lose privileges." When Ms. Zoe asked if he was threatening her, he said he liked talking to her and they could revisit this and left the room.

123. When Dr. Quick touched her, she felt paralyzed and as if she had no control. She thought about reporting him but she had reported other staff previously for other issues and no one took her seriously, she did not think she would be believed in this circumstance. She was also afraid to lose the psychological support Dr. Quick provided her. On multiple occasions she started typing an email to report him only to then delete it before sending due to fear of retaliation and losing the only care and support she had.

124. Two weeks later, on or around May 10, 2022, Dr. Quick again came to Plaintiff's room to conduct therapy. Ms. Zoe had just come out of the shower when he arrived.

125. During this session, Dr. Quick pulled Ms. Zoe against the wall, put his hands on her face, and again kissed Ms. Zoe on the lips.

21

126. Ms. Zoe was wearing loose clothing and was not wearing a bra. Dr. Quick proceeded to stroke her neck, and bare chest, and then put his hands in her pants and proceeded to digitally penetrate her vaginally. This continued for several minutes. After he stopped, he asked her if she was okay and she did not know what to say. She sat down on her bed and he sat on the other bed in her cell and talked to her for a few minutes before leaving her cell.

127. On or around May 17, 2022, while Dr. Quick was out, Ms. Zoe lost her single cell status and was placed in a unit with another prisoner.

128. This greatly exacerbated Plaintiff's anorexia and ASD symptoms because she had difficulty eating around other people and the noise of others dysregulated her, causing her a great deal of stress.

129. Ms. Zoe repeatedly requested placement back in a single cell, and specifically talked with Dr. Quick about making this happen. During the time she had a cellmate they met in a conference room instead of her cell. When she asked him about moving back to a single cell he said, "You need to help me and get the weight back so I can talk to the team about getting the room back."

130. Up until this point, Ms. Zoe viewed Dr. Quick as her savior and her confidante.

131. She believed that he cared about her and wanted to be with her.

132. On September 2, 2022, Dr. Quick was able to get Ms. Zoe transferred back to a single cell.

133. During the time that Ms. Zoe was housed with another prisoner, she and Dr. Quick had no physical or sexual contact.

134. Upon Ms. Zoe's arrival back in single cell, Dr. Quick came to check on her.

22

135.    When he entered her cell, he said "Congratulations, are you happy now?" pulled down his mask, held her face, and again kissed her on her mouth. At this time, Ms. Zoe realized that the cost of getting the single cell was going to be ongoing sexual contact with Dr. Quick, which ultimately did continue on a regular basis.

136.    Typically, Dr. Quick would arrive in Ms. Zoe's room, engage in sexual contact by kissing and touching her, and then walk with her to the conference room for therapy. Sometimes the two of them would have therapy sessions in Ms. Zoe's cell.

137.    On or around November 14, 2022, her unit was on COVID quarantine and Dr. Quick came to see her. At first a nurse told him he could not be there due to the quarantine but he came back about 30 minutes later and entered Plaintiff's cell. He took his mask off and they stood at the foot end of the bed, which is not viewable to the door. While he was there, he again kissed her and stroked her body including digitally penetrating her vagina and grabbing her breast.

138.    Later in November, on or around November 21, 2022, Ms. Zoe contracted COVID and went into COVID isolation. During that time, Dr. Quick came to see her but was unable to enter the cell due to the fact she was on COVID isolation. When she came out of isolation, he tried to touch her again but she was able to refuse. He again came to see her on January 5, 2023. When she told him she did not want to talk to him, he asked her if she was sure and said he would keep trying. He then gave her a quick kiss on the lips before leaving her cell.

139.    Dr. Quick continued abusing Ms. Zoe in this manner until December 2023, when Ms. Zoe finally reported the ongoing sexual abuse by Dr. Quick.

140.    Dr. Quick would regularly conduct private therapy sessions in Ms. Zoe's room when she was in a single cell.

23

141. This protocol was clearly violative of BOP policy, as male staff are not permitted to be alone with female prisoners in their cells, or otherwise.

142. In addition to vaginally penetrating Ms. Zoe with his fingers on many occasions, Dr. Quick also forced Ms. Zoe to manually masturbate him on multiple occasions.

143. During the course of these interactions, Ms. Zoe's feelings about these encounters would vacillate. She would sometimes tell Dr. Quick that she was uncomfortable with this contact, but she did not want to lose him as the only person whom she could rely on; she also believed that he was God-sent and was flattered.

144. He told Ms. Zoe not to report the sexual assaults and that he had a lot of power at the facility.

145. Dr. Quick's behavior towards Plaintiff was inconsistent and erratic; in some moments he would maintain a strictly professional relationship, and other times he would interact with Ms. Zoe as if they were lovers, using their therapy sessions to talk about personal things.

146. The sexual contact was entirely when and how Dr. Quick wanted it, without any discussion beforehand or knowledge from Ms. Zoe about whether it would occur.

147. The inconsistent behavior exhibited by Dr. Quick exacerbated Ms. Zoe's symptoms and were clearly contraindicative for someone with her mental health diagnoses.

148. Dr. Quick was well aware that his inconsistent behavior that took advantage of Ms. Zoe's vulnerabilities was antithetical to the therapeutic methods she needed.

149. As a direct result of the abuse Ms. Zoe began having difficulty eating again.

150. She felt used and discarded, and entirely at Dr. Quick's mercy.

24

151.    Throughout 2022 and 2023, several nurses and officers, names currently unknown to Plaintiff, found Dr. Quick alone in Ms. Zoe's cell during count time sitting less than an arm's length distance, and would find the two of them alone in the conference room together during count time.

152.    Additionally, officers would have been able to see Dr. Quick entering Ms. Zoe's cell by himself and remaining alone in her cell.

153.    This should have given officers notice that inappropriate conduct was occurring. Still, no staff member made a report or investigation.

154.    Given the overtness and frequency with which Dr. Quick preyed on Ms. Zoe, other BOP personnel suspected or should have suspected that he was sexually abusing her.

155.    Binding PREA regulations mandate staff reporting, where all BOP staff are required to "report immediately . . . **any knowledge, suspicion, or information** regarding an incident of sexual abuse or sexual harassment that occurred in a facility. . .; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation."  28 C.F.R. § 115.61(a).

156.    When an incarcerated person is subject to a substantial risk of imminent sexual abuse, BOP shall take immediate action to protect that person.  *See* 28 C.F.R. § 115.62. In addition, administrative investigations of alleged sexual abuse by a staff member are required to proceed "promptly, thoroughly, and objectively for all allegations, including third-party and anonymous reports." *Id.* § 115.71(a).  The presumptive disciplinary sanction for substantiated allegations of sexual abuse is termination.  *See id.* § 115.76(b).  Victims shall also be offered medical and mental health care by the BOP.  *See id.* § 115.83.

[4692468.5]

157.    Defendant United States and its agents, servants, contractors, and employees had numerous opportunities to follow the above-mentioned mandates and stop Dr. Quick's misconduct.  Dr. Quick's actions, including treating her in her cell, were abnormal, obvious, and suspicious for sexual misconduct.  In addition, upon information and belief, correctional officers in the control room were charged with monitoring the security cameras and following up on any suspicious activities that they noticed on the cameras.  These officers saw or should have seen that Dr. Quick frequently disappeared into unmonitored areas with prisoners who were not authorized to be in those areas alone with an officer.  Nevertheless, BOP personnel took no actions to investigate or stop this suspicious and recurrent behavior.

158.    Defendants and its agents, servants, contractors, and employees failed to investigate, discipline, supervise, monitor, question, or stop Dr. Quick despite numerous indications of sexual misconduct.  This was in direct violation of mandatory BOP policies, was not related to a discretionary function or duty, and served no plausible penological policy purpose.

159.    Defendants and their agents, servants, contractors, and employees had actual and constructive notice that Ms. Zoe's cell could be used as a site of sexual abuse.  Nevertheless, no BOP personnel came to investigate, intervene, or inquire as to Dr. Quick's interactions with Ms. Zoe.  This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

160.    After Ms. Zoe came forward about the sexual abuse by Dr. Quick in December 2023 by reporting to the DOJ on the computer, she was interviewed by FMC Carswell about the sexual abuse on January 5, 2024.

[4692468.5]

161. Following her reporting, Dr. Quick was placed on administrative leave but was subsequently reinstated and returned to the facility in November 2024. Ms. Zoe again wrote to BOP staff on November 17, 2024, requesting them to further investigate Dr. Quick after his return.

162. Following this report of Dr. Quick, FMC Carswell staff also began retaliating against Plaintiff.

163. By February 14, 2024, Ms. Zoe was charged with disciplinary charges and put in the medical SHU for three months, having had no significant prior disciplinaries. These disciplinary charges were later dismissed.

164. In her cell in the medical SHU, there were glass windows where officers would have full sight of Ms. Zoe.

165. As a result, Ms. Zoe was unable to eat since she was not afforded the privacy she needed to do so and due to her mental health conditions, she is unable to eat in view of others.

166. Additionally, placement in SHU meant she could not get commissary food items that helped her maintain her sugar levels and which provided her necessary comfort.

167. Consequently, she had a relapse of severe anorexia.

168. She was taken to an outside medical hospital one month after her placement in the SHU due to severe malnutrition.

169. Despite her rapidly declining weight and relapse of severe anorexia from February 2024 until April 2024, FMC Carswell continued to house Ms. Zoe in the SHU without appropriate medical care.

[4692468.5]

170.    Ms. Zoe was again placed in the SHU for a month on July 18, 2024 for a false positive on a urine analysis, despite having no history of drug use.  This disciplinary charge was later expunged.

171.    While in the SHU, Ms. Zoe was visited by Chaplain Farooqi.  These visits were reassuring to Ms. Zoe because she and Chaplain Farooqi shared similar social and cultural backgrounds and the two were able to communicate in similar languages.  Chaplain Farooqi helped Ms. Zoe feel less alone.

172.    On or around August 15, 2024, Ms. Zoe was removed from the SHU.

173.    The following day, Ms. Zoe visited Chaplain Farooqi where the two continued discussing personal things.  Again, Ms. Zoe felt like she had found someone who could understand her identity and cultural background.

174.    The following day, Ms. Zoe again went to Chaplain Farooqi's office.  This time, however, he got up from the table in which he sat and approached Ms. Zoe.  She thought he was going to walk by her.  Instead, he physically grabbed her face, neck, and breasts, and pulled her towards him.  He then kissed her mouth.  Ms. Zoe's first thought was to acquiesce because she believed it was the only way he would assist her.

175.    On August 18, 2024, Ms. Zoe attended the class Chaplain Farooqi led.  During this class, he stared at her the entire time and talked about sex.

176.    Ms. Zoe again felt used, violated, and unprotected by Defendants whose job it was to ensure her safety and protection.

177.    When Ms. Zoe was the healthiest, she was able to get her weight into the 90s, which was still under the ideal weight for someone of her size.  As a result of the current stress,

[4692468.5]

anxiety, and trauma caused by Dr. Quick and BOP's failure to protect her, Ms. Zoe last weighed in on April 3, 2025, weighing under 80 pounds.

178. Defendants' acts caused Plaintiff severe mental, physical, and emotional harm and exacerbated all of her already underlying mental health diagnoses.

179. Ms. Zoe has had numerous anorexia relapses.

180. She continues to battle anorexia, depression, chronic anxiety, severe retaliation, and has continued mistrust of all BOP staff. All of her previously underlying mental health diagnoses have been greatly exacerbated. She continues to suffer from debilitating psychological trauma, permanent and catastrophic psychological injuries, severe emotional distress, permanent physical ailments associated with psychological injuries, pain, humiliation, loss of enjoyment of life, and loss of quality of life.

181. The foregoing are permanent injuries as a direct result of Defendants' deliberate indifference to Plaintiff's health and safety, Defendants' disregard of the excessive risk of harm to Plaintiff's health and safety, and/or Defendants' negligent failure to promptly protect Plaintiff from foreseeable assaults. Plaintiff also suffers from other permanent injuries and deficits that will be established through expert consultation in this litigation.

182. Upon information and belief, Plaintiff will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Plaintiff's injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning.

**CONDITIONS PRECEDENT TO THIS LAWSUIT**

183. Plaintiff has properly complied with the requirements of 28 U.S.C. § 2675 by presenting an Administrative Claim against the United States of America (*i.e.*, Claim No.TRT-

[4692468.5]

SCR-2024-05085). The Claim was timely filed with the BOP on March 31, 2024, within two years of the accrual of the causes of action.

184. BOP acknowledged receipt of the Administrative Claim in a letter dated May 20, 2024, but Plaintiff has not received a further response from BOP disposing of this Claim to date. Under 28 U.S.C. § 2675(a), BOP's failure "to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim." In addition, under 28 C.F.R. § 14.2(c), when a pending Claim is amended, BOP "shall have six months in which to make a final disposition of the claim as amended." By the filing of this action, Plaintiff elects to deem BOP's lack of response within six months of the amendment of the Claim as the final denial of Plaintiff's Administrative Claim in its entirety. Therefore, Plaintiff exhausted requisite administrative remedies.

## CAUSES OF ACTION

### COUNT I – NEGLIGENCE UNDER FEDERAL TORT CLAIMS ACT
### (AGAINST DEFENDANT UNITED STATES OF AMERICA)

185. Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth herein.

186. At all relevant times, Defendant United States, individually or through its agents, servants, contractors, and/or employees undertook and endeavored to, and did provide custodial care to people incarcerated at FMC Carswell including but not limited to the Plaintiff.

187. At all relevant times, Defendant United States acted negligently in its indifference to Plaintiff's safety.

188. At all relevant times, Defendant United States hired correctional and administrative employees at FMC Carswell, including Dr. Quick and Chaplain Farooqi, as well as colleagues and supervisors of Dr. Quick whose identity are currently unknown to Plaintiff.

30

189.    At all relevant times, these personnel were all federal employees and were acting within the scope of their employment with the United States, in their official uniforms during work hours, performing work duties, when exercising custodial care, control, and supervision to Plaintiff.

190.    At all relevant times, FMC Carswell personnel held themselves out to incarcerated individuals as personnel with the ability and knowledge to carry out their duties, provide due care, and to act in accordance with standards of reasonable care common and acceptable in the community.

191.    At all relevant times and within the scope of their employment by Defendant United States, the above-named and unknown staff, while working within their official capacities at FMC Carswell, owed a non-delegable duty of care to Plaintiff while she was at FMC Carswell.

192.    It is Defendant United States duty to maintain, operate, and control FMC Carswell as a safe and secure space for persons in it, including but not limited to Plaintiff.

193.    In addition to a custodial duty owed to Plaintiff, Defendant United States of America was statutorily obligated under the Prison Rape Elimination Act and BOP policy to protect prisoners from foreseeable harm that included the sexual abuse suffered by Ms. Zoe.

194.    Defendant United States should have known that Dr. Quick had a propensity to sexually abuse inmates.

195.    Defendant United States should have known that Dr. Quick acted inappropriately with prisoners under his care at FMC Carswell.

196.    Defendant United States was on notice of the possibility that prisoners would be sexually abused by corrections officers and other facility staff, through above-mentioned investigations, articles, lawsuits, and reports.

[4692468.5]

197.    As such, there was a foreseeable risk that correctional officers and other staff would sexually abuse Plaintiff and others under their control.

198.    Despite actual and constructive notice of Dr. Quick's abuse, agents, servants, contractors, and/or employees of Defendant United States did not exercise reasonable care or take reasonable available measures to abate the risk of sexual abuse to Plaintiff, and to ensure their safety, in violation of federal regulations and BOP protocols.

199.    Despite actual and constructive notice of Dr. Quick's abuse, Defendant United States failed to create and implement procedures, training, and supervision that would protect prisoners from the foreseeable risk of harm, including sexual abuse.

200.    Despite actual and constructive notice of Dr. Quick's abuse, Defendant United States failed to adequately monitor and supervise employees, such as Dr. Quick, while employees were acting within the scope of their employment.

201.    Despite actual and constructive notice of Dr. Quick's abuse, Defendant United States knew of or should have known of the risk posed to Plaintiff and other prisoners that they would be sexually assaulted by employees such as Dr. Quick.

202.    Despite actual and constructive notice of Dr. Quick's abuse, Defendant United States failed to maintain its facilities in a manner to deter the possibility of sexual abuse, including the above-mentioned lack of video cameras and the availability of unmonitored and isolated spaces in the facility.

203.    Due to Defendant United States's herein described acts and omissions, it breached its duty to protect Plaintiff and other prisoners from the reasonably foreseeable harm of sexual abuse by its employees.

[4692468.5]

204.    Even though the United States' hiring, retention, and promotion of its employees are sometimes considered discretionary, when, as here, the United States was aware of its employees' tortious conduct, ignored and assisted in it, its retention of those employees does not represent a choice based on legitimate policy considerations.

205.    Agents, servants, contractors, and/or employees of the United States did not possess the necessary skill to maintain safe and secure environment and protect Plaintiff from foreseeable harm.

206.    Agents, servants, contractors, and/or employees of the United States neglected to apply the skill they did have.

207.    Agents, servants, contractors, and/or employees of the United States did not use reasonable care in applying the skill they had.

208.    Agents, servants, contractors, and/or employees of the United States mistreated Plaintiff and/or were negligent in other ways that are documented in the relevant records and/or in ways of which Plaintiff are not yet aware.

209.    Plaintiff's injuries were inflicted solely through the carelessness, recklessness, gross negligence, negligence, and deliberate indifference of Defendant United States and its agents, servants, contractors, and/or employees, and through no fault or want of care or contributory negligence on the part of Plaintiff.

210.    The failure of FMC Carswell personnel to prevent, investigate, or acknowledge Dr. Quick's or Chaplain Farooqi's sexual abuse served no legitimate policy purpose.  On the contrary, FMC Carswell staff were required by mandatory BOP policies and federal regulations to immediately intervene and investigate when they learned of his suspected sexual abuse.  Their failure to do so was patently outside of their discretionary function.

[4692468.5]

211.   Plaintiff's injuries were direct and proximate consequences of Defendant United States' (a) failure to enforce zero-tolerance policy against sexually abusive conduct, 28 C.F.R. § 115.11; (b) failure to supervise, monitor, and surveil one-on-one physical contact between BOP personnel and incarcerated persons, 28 C.F.R. § 115.13; (c) decision to hire, retain, and promote BOP personnel who was suspected or alleged to have had improper sexual contact, 28 C.F.R. § 115.17; (d) punishment of victims through disciplinary or retaliatory measures instead of providing proper support and protection, 28 C.F.R. § 115.43; (e) failure to report suspicion or allegation of sexual abuse, 28 C.F.R. § 115.61; (f) failure to protect victims from retaliation after reporting sexual abuse, 28 C.F.R. § 115.67; (g) failure to promptly, thoroughly, and objectively investigate all allegations or reports, 28 C.F.R. § 115.71(a); and (h) failure to discipline staff for sexual misconduct, 28 C.F.R. § 115.76.

## COUNT II – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM UNDER FEDERAL TORT CLAIMS ACT
### (AGAINST DEFENDANT UNITED STATES OF AMERICA)

212.   Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

213.   The above-described acts and omissions of FMC Carswell personnel, including Dr. Quick and Chaplain Farooqi, constituted extreme and outrageous conduct.

214.   Defendant United States, individually or through its agents, servants, contractors, and/or employees, directly caused or disregarded a substantial probability of causing severe emotional distress to Plaintiff.

215.   Defendant United States of America was negligent in its oversight and administration of FMC Carswell, which was a direct and proximate cause of Plaintiff's injuries.

216.   The acts and omissions of Defendant United States of America, described above, physically endangered Plaintiff and caused her injury through the sexual abuse she suffered and

34

[4692468.5]

caused debilitating emotional suffering.  These acts and omissions constitute the tort of negligent infliction of emotional distress under the laws of the District of Columbia.

217.    Under the FTCA, Defendant United States is liable for the acts and omissions of its agents, servants, contractors, and/or employees that occurred within the scope of their employment as here.

218.    As a direct and proximate result of the foregoing, Plaintiff suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

219.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

**COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM
UNDER FEDERAL TORT CLAIMS ACT
(AGAINST DEFENDANT UNITED STATES OF AMERICA)**

220.    Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

221.    Defendant United States acts and omissions herein and the acts and omissions of its agents, servants, contractors, and/or employees constituted extreme and outrageous conduct, which caused Ms. Zoe's severe emotional distress following her sexual abuse.

35

[4692468.5]

222. Defendant United States, individually or through its agents, servants, contractors, and/or employees intended to cause, or were recklessly indifferent to the probability of causing, Plaintiff severe emotional distress.

223. Plaintiff, in fact, suffered debilitating emotional suffering. Her emotional distress was so substantial and enduring that no reasonable person in a civilized society should be expected to endure it.

224. Dr. Quick and Chaplain Farooqi engaged in extreme and outrageous conduct through sexually assaulting Ms. Zoe while she was incarcerated under their care. Both abused their authority and power to cause her severe emotional distress, or was recklessly indifferent to the probability of causing such distress, when they sexually abused her while they were supposed to be providing medical care and religious support, respectively.

225. As Ms. Zoe's therapist, Dr. Quick knew of Ms. Zoe's mental health diagnoses, as well as her triggers, and needs for regulation. His abuse of his power in clear violation of his responsibilities as a BOP employee as well as his ethical responsibilities as a licensed therapist, further exhibits extreme and outrageous conduct.

226. Chaplain Farooqi also had reason to know of Plaintiff's vulnerabilities as her religious counselor.

227. At all relevant times, Dr. Quick and Chaplain Farooqi were acting within the scope of their employment at FMC Carswell, and used their authority as members of the facility's medical and religious staff, respectively, to sexually assault Plaintiff, while Plaintiff did not have the ability to consent or withhold consent.

228. Plaintiff's injuries and damages were caused, in whole or in part, by intentional torts (*e.g.*, intentional infliction of emotional distress, gender violence, sexual assault, and

[4692468.5]

battery) perpetrated by Dr. Quick and Chaplain Farooqi.  Under 28 U.S.C. § 2680(h), Defendant United States is liable for the intentional torts committed by Dr. Quick and Chaplain Farooqi, and their abuse of their position of authority as a prison therapist and religious counselor, respectively, within the scope of his employment and under color of federal law.

229.    At all relevant times, Defendants United States individually or through its agents, servants, contractors, and/or employees including Dr. Quick and Chaplain Farooqi, were acting under color of authority as "law enforcement officers" within the meaning of 28 U.S.C. § 2680(h).  At all relevant times, Dr Quick and Chaplain Farooqi supervised, disciplined, oversaw, monitored, controlled, directed, ordered, restrained, and imprisoned the Plaintiff within the scope and course of their employment with Defendant United States.  All BOP employees, including mental health staff are charged with maintaining security of the institution and staffs' correctional responsibilities precede all others required by this position and are performed on a regular and recurring basis.

230.    At all relevant times, Defendant United States individually or through its agents, servants, contractors, and/or employees including Dr. Quick and Chaplain Farooqi, used their authority as law enforcement officers to direct, order, restrain, force, overpower, intimidate, threaten, coerce, blackmail, harass, abuse, and assault the Plaintiff and to prevent her from disclosing the sexual assaults for fear of retaliation, victim-blaming or shaming, additional assaults, among others.

231.    Defendant United States is vicariously liable for the intentional torts committed upon the Plaintiff.  Therefore, Plaintiff brings this Claim for intentional infliction of emotional distress under the FTCA against the United States, based on the conduct of its officers including Dr. Quick.

[4692468.5]

232.    As a result of FMC Carswell personnel's use and abuse of their positions of authority as "law enforcement officers" within the course and scope of their employment, and as a direct and proximate result of the foregoing, Plaintiff suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

233.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

## COUNT IV – SEXUAL BATTERY UNDER FEDERAL TORT CLAIMS ACT
### (AGAINST DEFENDANT UNITED STATES OF AMERICA)

234.    Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

235.    Dr. Quick committed sexual battery on Ms. Zoe.  It was impossible for Ms. Zoe to provide consent under 18 U.S.C. § 2243(b), which constitutes a felony when a BOP employee knowingly engages "in a sexual act with another person who is (1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging."

236.    Dr. Quick acted within the scope of his authority and employment as a federal employee in the medical unit at FMC Carswell.

[4692468.5]

237. Ms. Zoe reasonably believed that Dr. Quick was in a position of control or authority, and she did not have the ability to consent or not consent to sexual acts that he initiated.

238. With the intent to cause harmful or offensive contact, Dr. Quick subjected Ms. Zoe to sexual acts to which she could not consent. These acts were deeply offensive to her personal dignity and would offend a person of ordinary sensitivity.

239. Chaplain Farooqi committed sexual battery on Ms. Zoe. It was impossible for Ms. Zoe to provide consent under 18 U.S.C. § 2243(b), which constitutes a felony when a BOP employee knowingly engages "in a sexual act with another person who is (1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging."

240. Chaplain Farooqi acted within the scope of his authority and employment as a federal employee in the medical unit at FMC Carswell.

241. Ms. Zoe reasonably believed that Chaplain Farooqi was in a position of control or authority, and she did not have the ability to consent or not consent to sexual acts that he initiated.

242. With the intent to cause harmful or offensive contact, Chaplain Farooqi subjected Ms. Zoe to sexual acts to which she could not consent. These acts were deeply offensive to her personal dignity and would offend a person of ordinary sensitivity.

243. As a direct and proximate result of the foregoing, Plaintiff suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of

39

[4692468.5]

life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

244.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

245.    Defendant United States of America is liable for the intentional torts committed by Dr. Quick and Chaplain Farooqi, and his abuse of his position of authority as a correctional officer within the scope of his employment.

## COUNT V – SEXUAL ASSAULT UNDER FEDERAL TORT CLAIMS ACT (AGAINST DEFENDANT UNITED STATES OF AMERICA)

246.    Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

247.    Plaintiff brings this Claim under the FTCA for sexual assault against Defendant United States of America, based on the conduct of its officers including Dr. Quick.

248.    Dr. Quick subjected Plaintiff to sexual acts with the intent to cause harmful or offensive contact.  His intentional torts caused Ms. Zoe's physical and emotional injuries, and Defendant United States of America is liable for intentional torts perpetrated by its agents within the scope of their employment.

249.    It was impossible for Ms. Zoe to provide consent under 18 U.S.C. § 2243(b), which constitutes a felony when a BOP employee knowingly engages "in a sexual act with another person who is (1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging."

[4692468.5]

250.    Dr. Quick acted within the scope of his authority and employment as a federal employee in the medical unit at FMC Carswell.

251.    Ms. Zoe reasonably believed that Dr. Quick was in a position of control or authority, and that she did not have the ability to consent or not consent to sexual acts that he initiated.

252.    Chaplain Farooqi subjected Plaintiff to sexual acts with the intent to cause harmful or offensive contact.  His intentional torts caused Ms. Zoe's physical and emotional injuries, and Defendant United States of America is liable for intentional torts perpetrated by its agents within the scope of their employment.

253.    It was impossible for Ms. Zoe to provide consent under 18 U.S.C. § 2243(b), which constitutes a felony when a BOP employee knowingly engages "in a sexual act with another person who is (1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging."

254.    Chaplain Farooqi acted within the scope of his authority and employment as a federal employee in the medical unit at FMC Carswell.

255.    Ms. Zoe reasonably believed that Chaplain Farooqi was in a position of control or authority, and that she did not have the ability to consent or not consent to sexual acts that he initiated.

256.    As a direct and proximate result of the foregoing, Plaintiff suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages,

41

[4692468.5]

both general and special, including but not limited to any past and future medical expenses and economic injuries.

257.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

258.    Defendant United States of America is liable for the intentional torts committed by Dr. Quick and Chaplain Farooqi, and his abuse of his position of authority as a correctional officer within the scope of his employment.

**COUNT IX – NEGLIGENT SUPERVISION UNDER FEDERAL TORT CLAIMS ACT**
**(AGAINST DEFENDANT UNITED STATES OF AMERICA)**

259.    Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

260.    Defendant United States of America hired Dr. Quick, Chaplain Farooqi, and other abusive employees, and allowed them to use their positions of power within the facility to exert influence over prisoners such as Ms. Zoe.

261.    Defendant United States knew that potential abusers such as Dr. Quick and Chaplain Farooqi would have the opportunity to be alone with female prisoners, particularly in secluded areas and areas without other facility personnel or video surveillance.

262.    Defendant United States failed to properly oversee and administer FMC Carswell, and failed to properly implement BOP and PREA policies that would have deterred sexual abuse such as that suffered by Ms. Zoe.

263.    Defendant United States had knowledge of the threat of future sexual abuse posed to prisoners as committed by facility staff, through the above-mentioned reports and lawsuits.

42

[4692468.5]

264.    Defendant United States's knowledge of prior sexual abuse at FMC Carswell placed it on notice of employees' propensity to engage in sexually abusive behavior with prisoners such as Ms. Zoe.

265.    If Defendant United States had properly supervised employees, facility staff such as Dr. Quick and Chaplain Farooqi would not have been able to sexually abuse prisoners.

266.    If Defendant United States had conducted thorough investigations of reported employees, Dr. Quick and Chaplain Farooqi would not have been able to continue sexually abusing prisoners, including Ms. Zoe.

267.    Defendant United States was also negligent in allowing employees it knew previously committed sexual abuse to continue to safeguard and monitor a female population of prisoners.

268.    If Defendant United States had properly supervised and investigated employees such as Dr. Quick and his supervisors, it would have learned of his propensity to commit sexual abuse.

269.    Defendant United States's above-described acts and omissions were a direct and proximate cause of Plaintiff's serious physical and emotional harm.

### COUNT X - Trafficking Victims Protection Reauthorization Act ("TVPA"), 18 U.S.C. § 1581, *et seq.* (AGAINST DEFENDANT REESE)

270.    Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

271.    Congress passed the Trafficking Victims Protection Act and subsequent reauthorization acts ("TVPA") to combat domestic human trafficking.

[4692468.5]

272.    TVPA is a comprehensive statutory framework imposing both criminal and civil liability, *see* 18 U.S.C. § 1595, of persons engaging or attempting to engage or benefit from sexual exploitation and labor trafficking or obstructing anti-trafficking enforcement.

273.    Specifically, the TVPA punishes anyone who attempts to, conspires to, or actively "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or . . . benefits, financially or by receiving anything of value, from participation in a [trafficking] venture" while knowing "that means of force, threats of force, fraud, coercion . . . will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a); 18 U.S.C. § 1594.

274.    "Coercion" means "threats of serious harm to or physical restraint against any person . . . any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person" or "the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2).

275.    "Serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." 18 U.S.C. § 1591(e)(5).

276.    The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action. 18 U.S.C. § 1591(e)(1).

44

277.    A commercial sex act is "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

278.    Additionally, the TVPA punishes anyone who "knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means.

a.    by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

b.    by means of serious harm or threats of serious harm to that person or another person;

c.    by means of the abuse or threatened abuse of law or legal process; or

d.    by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."  18 U.S.C. § 1589(a).

279.    The TVPA punishes anyone who knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d). 18 U.S.C. § 1589(b).

280.    The term "abuse or threatened abuse of law or legal process" in the forced labor provision means "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1).

[4692468.5]

281.    The term "serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(12).

282.    The TVPA also punishes anyone who "obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section," 18 U.S.C. § 1591(d).

283.    The TVPA allows for civil liability as set forth in 18 U.S.C. § 1595(a).

284.    An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees.  18 U.S.C. § 1595(a).

285.    Congress grants a plaintiff up to ten years in which to bring a civil action under 18 U.S.C. § 1595(c).  Dr. Quick made Plaintiff engage in sex acts through force and coercion.

286.    Defendant Reese, as Chief of the Office of Internal Affairs, knew or should have known that Dr. Quick had engaged in commercial sex acts with the Plaintiff in violation of the TVPA, and had a duty to protect prisoners, such as Ms. Zoe from reasonably foreseeable predators such as Dr. Quick.

287.    By her acts and omissions in failing to meet these duties, Defendant Reese benefitted through continued employment.

288.    Defendant Reese participated in a venture and facilitated the harboring and transportation of Plaintiff for purposes of sex induced by force, fraud, or coercion.

46

289.     Defendant Reese benefitted financially through continuing employment and advancement when she, through her own actions and those she directed in her office, ignored the conditions that led to Dr. Quick's abuse, and otherwise benefitted from facilitating this behavior that kept him in his role on the facility's medical staff.

290.     This conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm and she has a claim for damages for such violations under 18 U.S.C. § 1591, 18 U.S.C. § 1595.

**PRAYER FOR RELIEF**

Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.     An award of compensatory, punitive, and nominal damages to each named Plaintiff in an amount to be determined at trial;

2.     An award to Plaintiff of the costs of this suit and reasonable attorneys' fees and litigation expenses; and

3.     For such other and further relief as this Court may deem just and proper.

Respectfully submitted by,

*/s/ Deborah M. Golden*
Deborah M. Golden
DC Bar # 470-578

bex kolins
*DC Bar application Pending*
NC Bar # 58491

The Law Office of Deborah M. Golden
700 Pennsylvania Ave. SE, 2nd Floor
Washington, DC 20003
202-630-0332
dgolden@debgoldenlaw.com

47

48

Ernest Galvan (*pro hac vice* pending)
Kara J. Janssen (*pro hac vice* pending)
Luma Khabbaz (*pro hac vice* pending)
Ben Hattem (*pro hac vice* pending)
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
(415) 433-6830
EGalvan@rbgg.com
KJanssen@rbgg.com
LKhabbaz@rbgg.com
BHattem@rbgg.com

[4692468.5]