**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| **JANE ZOE,**<br>    FMC Carswell<br>    1200 MEANDERING ROAD<br>    FORT WORTH, TX 76114<br>        *Plaintiff*,<br><br>**v.**<br><br>**UNITED STATES OF AMERICA,**<br>    SERVE:<br>    Federal Tort Claims Act Section<br>    Tort Branch, Civil Division<br>    U.S. Department of Justice<br>    950 Pennsylvania Ave. NW<br>    Washington, DC 20530-0001<br><br>    U.S. Attorney's Office<br>    Crystal Hopper, Civil Process Clerk<br>    1100 Commerce St., Third Floor<br>    Dallas, TX 75242-1699<br><br>    U.S. Acting Attorney General Blanche<br>    U.S. Department of Justice<br>    950 Pennsylvania Ave. NW<br>    Washington, DC 20530-0001<br><br>**BUREAU OF PRISONS,**<br><br>**DR. BENJAMIN QUICK, in his individual capacity,**<br><br>**WARDEN RULE, in his official capacity,**<br><br><br>        *Defendants*. | Civil Action No.  4:26-cv-00193-P<br><br><br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT**

## INTRODUCTION

1.      In 2020, Jane Zoe[1] entered the Federal Bureau of Prisons (hereinafter "BOP") knowing she would be required to serve her term of imprisonment.  However, she did not imagine that during her sentence, she would be groomed, manipulated, controlled, and sexually assaulted by the prison therapist, Dr. Benjamin Quick (hereinafter "Dr. Quick" or "Quick"), who knew of her vulnerabilities and was entrusted with providing her mental health care while acting within the course and scope of his employment.  She also did not imagine that she would then be sexually abused by the Chaplain, a nurse, and another doctor and that BOP would once again take no action to protect her from ongoing abuse and retaliation or the harm caused by the abuse.

2.      Ms. Zoe has autism spectrum disorder and severe Anorexia Nervosa, resulting in frequent hospitalizations, and regular therapy sessions, which were necessary for her survival. BOP is aware—but has been deliberately indifferent—of these conditions and her treatment needs.

3.      Due to failures throughout the chain of command of the BOP, sexual predators have been free to prey upon incarcerated women whose safety they were tasked to ensure, including both Plaintiff's assigned therapist, Dr. Quick, and Chaplain Farid Farooqi (hereinafter "Chaplain Farooqi"), both still employed by BOP.

4.      The BOP leadership have been aware of the culture of sexual abuse throughout the agency and specifically at FMC Carswell—where people in their care had been reporting

_____

[1] Plaintiff is proceeding under a pseudonym to protect her privacy.

2

sexual abuse by officers and other staff for years—and yet did nothing to meaningfully respond or otherwise protect the people incarcerated there.

5.    As a direct result of these failures, Ms. Zoe, an already vulnerable woman, was targeted by a sexual predator who knew of her triggers and mental health needs, while he sexually assaulted her for over a year, and then retaliated against her when she came forward and filed a report.

6.    These failures by the BOP also resulted in Ms. Zoe being targeted again by the Chaplain in the guise of providing her religious services.  She reported his abuse and was subsequently retaliated against including being placed in the SHU on multiple occasions.

7.    She was again targeted and assaulted by medical staff who were supposed to be providing her treatment as a medically fragile patient.

8.    She continues to suffer retaliation from BOP staff to this day.

9.    Ms. Zoe suffers from ongoing trauma because of the sexual abuse and retaliation she suffered, as well as the flagrant abuse of power by therapist, Dr. Quick, and his failure to provide medically necessary and required treatment for her severe mental health needs.  She has chronic nightmares, anxiety, and depression.  She remains in the custody of the BOP and fears continual assault by those responsible for her care.  She is afraid to access mental health care and religious supports due to the abuse and failure of BOP to protect her.

10.    Plaintiff brings this suit in connection with the deficient supervision and custodial care provided to her by various personnel, including Dr. Quick and Chaplain Farooqi within the scope of their employment with the BOP.  Plaintiff seeks redress for Defendants' unlawful conduct, which caused her to suffer permanent and catastrophic injuries.

[4852288.12]

11.     BOP's failures cause ongoing harm to Plaintiff.  These failures are in violation of the Eighth Amendment's prohibition on cruel and unusual punishment and First Amendment protections for reporting staff misconduct, as well as federal statutory law, including the Trafficking Victims Protection Act ("TVPA") and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et. seq.*  These failures also violate Texas state laws.

## JURISDICTION AND VENUE

12.     This action involves claims arising under United States and Texas laws. Plaintiff's claims are predicated, in part, upon the FTCA, 28 U.S.C. §§ 2671, *et seq.*, authorizing actions seeking relief against the United States.  The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1346(b)(1), 1367, and 1343(a)(4).

13.     Venue is proper in this district under 28 U.S.C. § 1391 because acts or omissions giving rise to the claims occurred in this district, and under 28 U.S.C. § 1391(3) because the individual Defendants are subject to this Court's personal jurisdiction.

## PARTIES

14.     The Plaintiff, Jane Zoe, was at all times relevant here incarcerated in BOP facilities, including FMC Carswell, located at 1200 Meandering Road, Fort Worth, Texas 76114, where she remains today.

15.     The Defendant United States of America ("United States") is liable for the tortious acts of its employees in accordance with the FTCA and is the appropriate Defendant for Plaintiff's claims under the FTCA.  The United States is a sovereign entity that has waived immunity for certain claims, including the claims set forth herein, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur with the scope of their employment.

[4852288.12]

16.     The BOP is a component of Defendant United States of America's Department of Justice. The BOP operates and is in possession and control of the Federal Medical Center Carswell ("FMC Carswell"). FMC Carswell is a federal female medical correctional institution providing special medical and mental health needs.

17.     At all times relevant hereto, Defendant United States acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all BOP matters including at FMC Carswell and responsible for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel, including but not limited to Dr. Quick, Chaplain Farooqi, and the operation of the Office of Internal Affairs which is responsible for investigating staff misconduct.

18.     Defendant Warden Rule is the current Warden at FMC Carswell. He is sued in his official capacity.

19.     Defendant Benjamin Quick was a Correctional Officer, working as a psychologist, at FMC Carswell at all times relevant to this action. He is sued in his individual capacity.

20.     While acting and failing to act as alleged herein, Defendants had complete custody and total control of Plaintiff.

21.     Plaintiff was dependent upon Defendants for her personal security and necessities.

22.     In performing the acts and/or omissions contained herein, Defendants, and each of its employees, acted under color of federal law, each acted maliciously, callously, intentionally, recklessly, with gross negligence, and with deliberate indifference to the rights and personal security of Plaintiff. Each of them knew or should have known that their conduct, attitudes, actions, and omissions were, and are, a threat to Plaintiff and to her constitutionally, statutorily,

5

and common law protected rights.  Despite this knowledge, Defendants failed to take steps to protect Plaintiff and to ensure her rights to safety from sexual assault.

23.     Defendants are liable for the tortious acts of its employees as well as the negligent failure to properly investigate.  At all times relevant hereto, each Defendant was the agent, representative, or employee of each other Defendant.  At all times relevant hereto, each Defendant, as well as Dr. Quick and Chaplain Farooqi, was acting within the course and scope of said alternative agency, representation, or employment and was within the scope of their authority, whether actual or apparent.  At all times relevant hereto, each Defendant was the authorized agent, partner, servant or contract of each other Defendant, and the acts and omissions herein alleged were done by them acting through such capacity, within the scope of their authority, with the permission, ratification, approval, and consent of the United States and Defendants.  Accordingly, each of them is jointly and severally liable to Plaintiff.

## STATEMENT OF FACTS

### THERE IS A LONG-STANDING HISTORY OF SEXUAL ABUSE AT FMC CARSWELL AND THROUGHOUT THE BOP

24.     Sexual abuse by correctional officers and other prison staff at BOP facilities in the United States has been documented for decades.

25.     In 1999, Amnesty International published a report titled "*Not part of my sentence: Violations of the human rights of women in custody.*"

26.     That Amnesty Report detailed:

Many women in prisons and jails in the USA are victims of sexual

abuse by staff, including sexually offensive language; male staff

[4852288.12]

touching inmates' breasts and genitals when conducting searches;

male staff watching inmates while they are naked; and rape.[2]

27.     The Amnesty Report was widely circulated and read by responsible corrections professionals.

28.     FMC Carswell is the only federal all-female medical prison in the United States and houses incarcerated people requiring more intensive medical and mental health care.

29.     Any incarcerated person identified as care level 3 or 4, the two highest care levels, will be automatically transferred to FMC Carswell.

30.     From 2014 to 2018, 35 women at the FMC Carswell reported sexual abuse from staff members.  This number was the highest rate of reported sexual abuse of any federal women's prison, until recent news about FCI Dublin, the federal prison infamously referred to as the "rape club."[3]

31.     The Amnesty Report found that FMC Carswell "has been plagued with systemic sexual abuse for years," revealing hundreds of pages of incident reports, federal records, and court documents documenting a pattern of sexual misconduct and cover-ups.

32.     The true number of assaults that occurred over this period at FMC Carswell is likely worse than records indicate because many incarcerated people do not report sexual assaults for fear of retaliation.

33.     Since 1997, at least 12 correctional staff at FMC Carswell have been convicted of sexual abuse that occurred while at FMC Carswell.

---

[2] Amnesty International, *Not part of my sentence: Violations of the human rights of women in custody,* available at https://www.amnesty.org/en/documents/amr51/001/1999/en/.

[3] Kaley Johnson, *Fort Worth Carswell women's prison plagued by sexual abuse, cover ups,* Star-Telegram, Sept. 2, 2022, https://www.star-telegram.com/news/local/crime/article264613401.html.

[4852288.12]

34.    Two lawsuits were filed by two women related to the 2021 repeated sexual assaults by recreation specialist Marerllis Nix, who was a known sexual predator.

35.    FMC Carswell staff witnessed Nix take women to isolated areas of the prison, outside the view of cameras, but failed to intervene.[4]

36.    In October 2025, Nix was convicted criminally of sexually abusing incarcerated people. *See* 4:25-cr-00116-O.

37.    In 2004, FMC Carswell officer Michael Lawrence Miller was found guilty of 5 counts of assault, abusive sexual contact with a ward, abusive sexual contact, sexual abuse of a ward, and aggravated sexual abuse.[5]

38.    In 2008, an FMC Carswell chaplain was sentenced to four years in prison for sexually abusing women in his custody.[6]

39.    One woman reported abuses that occurred in 2011, 2012, 2015, 2017, and 2018. These abuses included rape committed by two federal officers who also beat her unconscious and attacked her with a burning liquid after she reported the rape.[7]

---

[4] Megan Cardona, *Sexual abuse a 'severe problem' at Fort Worth's Carswell prison, attorneys for 2 women say*, KERA News, Mar. 11, 2024, https://www.keranews.org/criminal-justice/2024-03-11/fort-worth-carswell-sexual-abuse-federal-prison-2-victims.

[5] Michael Rigby, Sexual Predation Rampant at FMC-Carswell; Another Employee Convicted, Prison Legal News, May 15, 2007, https://www.prisonlegalnews.org/news/2007/may/15/sexual-predation-rampant-at-fmc-carswell-another-employee-convicted/.

[6] *Priest Who Sexually Abused Inmates at FMC Carswell in Fort Worth Sentenced to 4 Years in Federal Prison,* US DOJ OIG, May 5, 2008, https://oig.justice.gov/sites/default/files/2020-05/2008-05-05.pdf.

[7] Kaley Johnson, *Pakistani prisoner beaten and sexually assaulted in Fort Worth federal prison, lawsuit says*, KERA NEWS, Sept. 25, 2024, https://www.keranews.org/criminal-justice/2024-09-25/aafia-siddiqui-carswell-pakistani-prisoner-sexual-assault-fort-worth-federal-prison-lawsuit.

[4852288.12]

40.     From 2012 to 2021, the BOP Office of Internal Affairs substantiated at least 16 cases of BOP staff sexually abusing women incarcerated at FMC Carswell, almost all before Dr. Quick raped Plaintiff.[8]

41.     In 2016, BOP employee Matthew McGaugh began sexually abusing an incarcerated woman under his custody.  She reported him but faced constant retaliation.  He was convicted in 2017.[9]

42.     In 2021, Lieutenant Luis Curiel sexually abused three women.  He was reported in June or July 2021 by another staff member, yet he was allowed to remain working at FMC Carswell where he continued sexually assaulting incarcerated people.  He pled guilty to two counts of sexual abuse and admitted in the criminal prosecution that he had sexually abused three women under his custody at FMC Carswell.[10]

43.     A BOP staff member who worked at FMC Carswell described the prison as "the perfect place for sexual misconduct," but remained anonymous for fear of retaliation.  This same officer had previously reported a lieutenant for exchanging drugs for sex, and was subsequently retaliated against and fired.[11]

44.     Upon information and belief, in late 2025, a paramedic was walked out of FMC Carswell for sexually abusing multiple incarcerated women.

---

[8] *Sexual Abuse of Female Inmates in Federal Prison*, United States Senate, Dec. 13, 2022, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf

[9] *Former BOP Employee Sentenced for Engaging in Sexual Acts with Inmate*, USAO Press Release, Nov. 7, 2017, https://www.justice.gov/usao-ndtx/pr/former-bop-employee-sentenced-engaging-sexual-acts-inmate.

[10] *See United States v. Luis Curiel*, 4-22-cr-00132 (N.D.T.X) 2022.

[11] *See*, supra, 4.

[4852288.12]

45.     The Prison Rape Elimination Act ("PREA") of 2003 required the Attorney General to promulgate rules to prevent sexual abuse in prison facilities. *See* 34 U.S.C. § 30307. In 2012, the U.S. Department of Justice issued regulations designed to "prevent, detect, and respond to prison rape." 28 C.F.R. § 115, 77 Fed. Reg. No. 119 (June 20, 2012). These regulations were immediately binding on BOP facilities. *Id*.

46.     Under PREA regulations, BOP is required to "train all employees who may have contact with inmates" on the following: its "zero-tolerance policy for sexual abuse and sexual harassment"; prevention, reporting, detection, and response to such behavior; "the right of inmates to . . . be free from retaliation for reporting sexual abuse and sexual harassment"; signs and dynamics of sexual abuse in confinement, and "common reactions of … victims"; and "how to avoid inappropriate relationships with inmates." *Id*. § 115.31(a).

47.     The regulations greatly restrict the circumstances whereby officers may view incarcerated people's naked bodies. Facilities are also required to "implement policies and procedures that enable inmates to shower, perform bodily functions, and change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks." *Id*. § 115.15(d).

48.     The PREA regulations also require that agencies ensure facilities "develop, document, and make its best efforts to comply on a regular basis with a staffing plan that provides for adequate levels of staffing, and, where applicable, video monitoring, to protect inmates against sexual abuse." *Id*. § 115.13(a). Pursuant to the regulations, facilities shall take into consideration a number of factors related to staffing and video monitoring, including any "findings of inadequacy" from federal investigative agencies and oversight bodies. *Id*.

10

§ 115.13(a)(3)-(4).  They shall also take into consideration any "blind-spots" in the facility or "areas where staff or inmates may be isolated." *Id*. § 115.13(a)(5).

49.    In the PREA Audit Report at FMC Carswell conducted in the beginning of 2022, it was noted that in just the previous 12 months, 9 officers were referred for criminal prosecution for sexually assaulting a prisoner.[12]

50.    Despite the audits, lawsuits, and criminal referrals, the abuse has continued and Defendants failed to take appropriate action to prevent future abuse, such as that experienced by Plaintiff, and continued to allow male staff to spend a significant amount of time alone and unsupervised with incarcerated women at FMC Carswell.[13]

51.    In July 2022, a DOJ working group was tasked to address "reported and proven sexual misconduct by Federal Bureau of Prisons ("BOP") employees" by reviewing the DOJ's approach to monitoring and deterring employee sexual misconduct.[14]

52.    The working group noted long-standing, pervasive problems throughout the BOP. The working group also learned of long-standing insufficient reporting mechanisms, "flawed investigations," and examples of "inadequate administrative sanctions and initial prosecutorial declinations for employees ultimately convicted of egregious misconduct."[15]

---

[12] Robert Palmquist, Prison Rape Elimination Act Audit Report, Apr. 6, 2022, https://www.bop.gov/locations/institutions/crw/crw_prea.pdf.

[13] Undersigned counsel currently represents an additional five women who have alleged sexual assault by different officers and staff at FMC Carswell.

[14] The Principal Associate Deputy Attorney General Working Group of DOJ Components, *Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons*, Nov. 2, 2022, https://www.justice.gov/d9/pages/attachments/2022/11/03/2022.11.02_bop_sexual_misconduct_working_group_report.pdf.

[15] *Id*.

[4852288.12]

53.    The working group found that "advocates and formerly incarcerated women identified several obstacles to reporting sexual abuse, including a fear of not being believed, a fear of retaliation, and a fear that reporting would not result in consequences for the perpetrator."

54.    The working group found that "formerly incarcerated individuals reported that corrections officers have threatened retaliation against reporting individuals, including by restricting access to children."

55.    One particular problem it found was that, until the early 2020s, "SIS officers were encouraged during initial intake interviews to obtain from victims sworn declarations in writing under penalty of perjury, presumably for a later administrative investigation."

56.    This practice was a problem because "There is no legal requirement for sworn statements or affidavits, and the evidentiary value of these sworn affidavits may be limited.  At the same time, requiring such sworn statements run counter to trauma-informed practices and may chill reporting, as it heightens a victim's fear that she may face prosecution if her account is not believed."

57.    Finally, the working group noted the problems created by blind spots in many women's prisons and suggested that the "BOP should continue to upgrade camera technology and implementation and, beginning with female institutions, review and expand coverage of currently deployed cameras across BOP systems to eliminate 'blind spots.'"[16]

58.    The working group also issued elementary guidance regarding establishing an appropriate tone about sexual misconduct at BOP facilities: "The Director of BOP should issue a

---

[16] *Id*.

12

message reiterating the gravity of sexual misconduct and expressing that sexual misconduct will not be tolerated."[17]

59.    The implication of this guidance given the ongoing, rampant abuse within BOP, is that this message had not been communicated to BOP staff.

60.    An investigation by the Associated Press published in 2021 unfolded that over a hundred federal prison workers had been convicted or arrested for crimes since 2019, including a drug treatment specialist at Kentucky prison medical center who threatened incarcerated people's lives if they did not comply with sexual abuse.[18]

61.    The AP reporting also uncovered the Justice Department's failure to adhere to standard practice by not removing or suspending a prison official tasked with investigating staff misconduct, who was the subject of complaints and arrests himself.[19]

62.    In October 2022, the DOJ Office of the Inspector General issued a report detailing its concerns over how the BOP had been handling of administrative misconduct investigations and incarcerated people's statements relevant to those investigations.[20]

63.    The OIG specifically noted that "The BOP's reluctance to rely on evidence provided by inmates enhances the likelihood that employees who have engaged in misconduct

---

[17] *Id*.

[18] Michael Balsamo, *Workers at federal prisons are committing some of the crimes*, TORONTO STAR, Nov. 14, 2021, https://www.thestar.com/news/world/united-states/workers-at-federal-prisons-are-committing-some-of-the-crimes/article_e52cd284-d095-5caa-8e5f-90173c580ffd.html.

[19] *Id.*

[20] Michael E. Horowitz, *Management Advisory Memorandum: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees*, Oct. 2022, https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

[4852288.12]

avoid accountability for their actions and remain on staff, thereby posing serious insider threat potential, including the risk of serious harm to inmates." [21]

64.    The OIG further noted that the BOP's procedures had historically created a problem because "to the extent that the BOP's reluctance to rely on inmate testimony is known to its employees, this reluctance likely emboldens miscreant staff members in their interactions with inmates because such staff members may act without fear of disciplinary consequences." [22]

65.    The report explained that the "OIG has serious concerns that that the BOP is reluctant to rely on inmate testimony in administrative misconduct investigations, has a general practice of avoiding calling inmates as witnesses in MSPB and arbitration proceedings, and, at least in matters involving staff on inmate sexual assault, is effectively requiring significantly more proof than necessary under the applicable preponderance of the evidence standard to sustain misconduct and take disciplinary action against BOP employees." [23]

66.    In sum "The OIG concluded that this manner of handling misconduct by BOP employees is contrary to federal regulations and BOP policy and creates significant risks for the BOP."[24]

67.    Defendants took no meaningful action to address the culture, physical plant, or supervision at FMC Carswell.

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] Michael E. Horowitz, *Management Advisory Memorandum: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees*, Oct. 2022, https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

14

[4852288.12]

68.     In short, the long history of Defendants' mismanagement created the conditions that led directly to Ms. Zoe being targeted and repeatedly sexually assaulted by a BOP staff member.

### BOP STAFF EXPLOITED MS. ZOE'S VULNERABILITY DUE TO HER MENTAL AND MEDICAL HEALTH TO ABUSE HER

69.     Plaintiff was diagnosed with Autism Spectrum Disorder (ASD, formerly known as Aspergers syndrome) in childhood.

70.     ASD is a neurological and developmental disorder that impacts how a person communicates, learns, interacts with others, and behaves.

71.     People with ASD may have difficulty with social communication and interacting with other people, restricted and repetitive behaviors, and other symptoms that affect their ability to function in day-to-day life.[25]

72.     As a result of her ASD, Plaintiff gets overwhelmed and disoriented by television noise, flashing lights, and other sounds and noises.

73.     Plaintiff needs consistency and a daily routine and becomes agitated and disoriented with sudden or unexpected changes in her routines.

74.     Because of her sensitivity to textures, changes, and inconsistency, Plaintiff wears the same old torn clothing because it provides her with a sense of safety.

75.     Plaintiff has trouble connecting with other people or socializing and has often been characterized as "cold."

76.     Additionally, Plaintiff is especially sensitive to texture, smell, consistency, and appearance of foods.

---

[25] https://www.nimh.nih.gov/health/publications/autism-spectrum-disorder.

[4852288.12]

77.    Plaintiff never grew up being able to eat food around family members or other people, a challenge that continued to persist in prison.  As a result, Ms. Zoe has consistently requested a single cell.

78.    In addition to ASD, Plaintiff has suffered from Anorexia Nervosa (Anorexia) since her teenage years.

79.    Anorexia is an eating disorder in which someone restricts the number of calories they consume resulting in mental, behavioral, and physical symptoms.  Because of the deficit of nutrients and calories, anorexia can result in life-threatening complications.[26]  Plaintiff's history of anorexia has become life-threatening.

80.    Incarceration has further exacerbated Plaintiff's anorexia.  In 2020, when she entered the BOP, Ms. Zoe weighed 58 pounds and had a Body Mass Index (BMI) of less than 11. It has been difficult for Ms. Zoe to maintain a healthy weight while incarcerated and she has had frequent relapses in her anorexia.

81.    Plaintiff's medical records note that she is consistently severely malnourished and severely underweight.

82.    As a result of her anorexia, Plaintiff has developed additional serious medical conditions, including worsening conditions of Gastroesophageal reflux disease (GERD), hypotension, weakened muscles and bones, and heart palpitations.

83.    Furthermore, because of her low weight and corresponding muscle and bone weakness, Ms. Zoe has sporadically been confined to a wheelchair, unable to bear her own body weight.

---

[26] Cleveland Clinic, Anorexia Nervosa, (Aug. 9, 2024), accessible at https://my.clevelandclinic.org/health/diseases/9794-anorexia-nervosa.

[4852288.12]

84.    Eating disorders are a form of mental illness, to which the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) devoted an entire chapter.[27]

85.    The Academy for Eating Disorders considers anorexia nervosa and bulimia nervosa as well as their variants to be "biologically based, serious mental illnesses (BBMI) that warrant the same level and breadth of health care coverage as conditions currently categorized in this way (*e.g.*, schizophrenia, bipolar disorder, depression, obsessive-compulsive disorder)."[28]

86.    BBMIs impair judgment, cognitive function, and emotional stability.[29]

87.    Anorexia has the second-highest death rate of any mental illness, second only to opioid overdoses.[30]

88.    People with anorexia can die by suicide, but anorexia can also be fatal in other ways.  Anorexia causes irregular heart rhythms, which can be fatal.  It also causes an imbalance of important minerals which can be fatal.  Anorexia, if left untreated, can cause organ failure.[31]

89.    People with anorexia may be resistant to treatment because of how malnutrition affects the brain.[32]

90.    As her treating psychologist, Dr. Quick knew the mental health implications of Plaintiff's serious anorexia when he abused her and that it could make her more vulnerable to abuse.

---

[27] DSM-IV at 539-550.  The more recent DSM-5-TR includes Anorexia Nervosa and Bulimia Nervosa in the overall chapter on Feeding and Eating Disorders.  DSM-5-TR at 381-392.

[28] Klump et al., *Academy for Eating Disorders Position Paper: Eating Disorders Are Serious Mental Illnesses*, 42:2 International Journal of Eating Disorders 97-103, 97 (2009) accessible at https://evelyntribole.com/wp-content/uploads/AED-Eating-Disordrs.Mental-Illness.pdf.

[29] *Id.* at 98.

[30] *See* Anorexia nervosa, Mayo Clinic, accessible at https://www.mayoclinic.org/diseases-conditions/anorexia-nervosa/symptoms-causes/syc-20353591.
[31] *Id.*
[32] *Id.*

[4852288.12]

91.     Her mental health diagnoses have created additional struggles with staff and incarcerated people in the prison setting.

92.     She is regularly bullied by staff and other incarcerated persons who mock her for the difficulty she has socializing, the repeated rituals she must perform, as well as the avoidance of aversive triggers and other coping mechanisms she uses.

93.     As a result of Ms. Zoe's mental health diagnoses, anorexia, and the related-bullying, Ms. Zoe has been isolated since her incarceration and is particularly vulnerable.

## FMC CARSWELL AND THE ONGOING ASSAULTS ON MS. ZOE

94.     Plaintiff entered the BOP in November 2020 and was immediately transferred to FMC Carswell because of her mental health and medical needs.

95.     Upon arrival, she was identified as medical care level 4, which is the highest care level, and mental health care level 3.

96.     Plaintiff began seeing Benjamin Quick, PhD, the therapist assigned to work with her in November 2020.

97.     Prisoners identified as mental health care level 3 are required to see a therapist at least once a week.

98.     Between November 2020 and December 2021, when Ms. Zoe was identified as mental health care level 3, she saw Dr. Quick twice a week.

99.     Because Dr. Quick was her therapist, Plaintiff confided in him and began trusting him.

100.    While she felt ostracized by other prisoners and staff, she felt that Dr. Quick was the one person on whom she could rely.

101.    Around November 2021, Plaintiff's mental health had improved and she was downgraded to mental health care and medical care level 2.

18

[4852288.12]

102. In early December 2021, she was transferred from FMC Carswell, and spent some time at the Oklahoma Transfer Center before being transferred to FCI Waseca.

103. In March 2022, however, Plaintiff had an anorexia setback and her mental health care level was raised to 3 and medical care level was raised to 4.

104. She was sent back to FMC Carswell and arrived back at FMC Carswell on March 17, 2022.

105. Plaintiff began seeing Dr. Quick again towards the end of March 2022.

106. Because she was again mental health care level 3, Ms. Zoe saw Dr. Quick once or twice a week.

107. Up until this point, Plaintiff and Dr. Quick had a purely professional therapeutic relationship, where Ms. Zoe was Dr. Quick's patient.

108. On April 25, 2022, Plaintiff's birthday, Dr. Quick sought Ms. Zoe out in the computer room to wish her a happy birthday.

109. He then proceeded to walk Ms. Zoe back to her cell in Nursing Care Center 1, where she would regularly have therapy sessions with him.

110. He entered Ms. Zoe's cell and then proceeded to kiss her on her mouth.

111. She began crying, and he pulled her close and began stroking her neck, hair, and back.

112. He knew that these actions were all soothing methods particularly calming for individuals with ASD, and for Ms. Zoe especially.

113. He then left the room. Ms. Zoe felt ashamed and confused by this, while she wanted Dr. Quick's support, she knew this was inappropriate and tried to tell herself it was a one-time thing.

[4852288.12]

114.    The following week Dr. Quick saw her again and she asked him not to kiss her again.  He responded "Okay, but did you like it?  I could tell from your face that you liked it. Tell me the truth."  Ms. Zoe responded that she is married and a prisoner to which Dr. Quick responded, "You are not with your husband now.  I don't want you to be in the prison but I would have never met you if you did not come to the prison."  Ms. Zoe said she would tell people if it happened again to which Dr. Quick responded, "If you try no one will believe you. Look at how you have been framed.  Nobody will believe what you say.  You will lose privileges."  When Ms. Zoe asked if he was threatening her, he said he liked talking to her and they could revisit this and left the room.

115.    When Dr. Quick touched her, she felt paralyzed and as if she had no control.  She thought about reporting him but she had reported other staff previously for other issues and no one took her seriously.  She did not think she would be believed in this circumstance.  She was also afraid to lose the psychological support Dr. Quick provided her.  On multiple occasions she started typing an email to report him only to then delete it before sending due to fear of retaliation and losing the only care and support she had.

116.    Two weeks later, on or around May 10, 2022, Dr. Quick again came to Plaintiff's room to conduct therapy.  Ms. Zoe had just come out of the shower when he arrived.

117.    During this session, Dr. Quick pulled Ms. Zoe against the wall, put his hands on her face, and again kissed Ms. Zoe on the lips.

118.    Ms. Zoe was wearing loose clothing and was not wearing a bra.  Dr. Quick proceeded to stroke her neck and bare chest, and then put his hands in her pants and proceeded to digitally penetrate her vaginally.  This continued for several minutes.  After he stopped, he asked

20

her if she was okay and she did not know what to say. She sat down on her bed and he sat on the other bed in her cell and talked to her for a few minutes before leaving her cell.

119. On or around May 17, 2022, while Dr. Quick was out, Ms. Zoe lost her single cell status and was placed in a unit with another incarcerated person.

120. This greatly exacerbated Plaintiff's anorexia and ASD symptoms because she had difficulty eating around other people and the noise of others dysregulated her, causing her a great deal of stress.

121. Ms. Zoe repeatedly requested placement back in a single cell, and specifically talked with Dr. Quick about making this happen.

122. During the time she had a cellmate they met in a conference room instead of her cell.

123. When she asked him about moving back to a single cell he said, "You need to help me and get the weight back so I can talk to the team about getting the room back."

124. Up until this point, Ms. Zoe viewed Dr. Quick as her savior and her confidante.

125. She believed that he cared about her and wanted to be with her.

126. On September 2, 2022, Dr. Quick was able to get Ms. Zoe transferred back to a single cell.

127. During the time that Ms. Zoe was housed with another incarcerated person, she and Dr. Quick had no physical or sexual contact.

128. Upon Ms. Zoe's arrival back in single cell, Dr. Quick came to check on her.

129. When he entered her cell, he said "Congratulations, are you happy now?" He then pulled down his mask, held her face, and again kissed her on her mouth.

21

[4852288.12]

130.     At this time, Ms. Zoe realized that the cost of getting the single cell was going to be ongoing sexual contact with Dr. Quick, which ultimately did continue on a regular basis.

131.     Typically, Dr. Quick would arrive in Ms. Zoe's room, engage in sexual contact by kissing and touching her, and then walk with her to the conference room for therapy.  Sometimes the two of them would have therapy sessions in Ms. Zoe's cell.

132.     On or around November 14, 2022, her unit was on COVID quarantine and Dr. Quick came to see her.  At first a nurse told him he could not be there due to the quarantine but he came back about 30 minutes later and entered Plaintiff's cell.

133.     He took his mask off and they stood at the foot end of the bed, which is not viewable from the door.

134.     While he was there, he again kissed her and stroked her body including digitally penetrating her vagina and grabbing her breast.

135.     Later in November, on or around November 21, 2022, Ms. Zoe contracted COVID and went into COVID isolation.  During that time, Dr. Quick came to see her but was unable to enter the cell due to the fact she was on COVID isolation.

136.     When she came out of isolation, he tried to touch her again but she was able to refuse.

137.     He again came to see her on January 5, 2023.  When she told him she did not want to talk to him, he asked her if she was sure and said he would keep trying.

138.     He then gave her a quick kiss on the lips before leaving her cell.

139.     Dr. Quick continued abusing Ms. Zoe in this manner until December 2023, when Ms. Zoe finally reported the ongoing sexual abuse by Dr. Quick.

22

[4852288.12]

140. Dr. Quick would regularly conduct private therapy sessions in Ms. Zoe's room when she was in a single cell.

141. This protocol was clearly violative of BOP policy, as male staff are not permitted to be alone with incarcerated females in their cells, or otherwise.

142. In addition to vaginally penetrating Ms. Zoe with his fingers on many occasions, Dr. Quick also forced Ms. Zoe to manually masturbate him on multiple occasions.

143. During the course of these interactions, Ms. Zoe's feelings about these encounters would vacillate. She would sometimes tell Dr. Quick that she was uncomfortable with this contact, but she did not want to lose him as the only person whom she could rely on; she also believed that he was God-sent and was flattered.

144. He told Ms. Zoe not to report the sexual assaults and that he had a lot of power at the facility.

145. Dr. Quick's behavior towards Plaintiff was inconsistent and erratic; in some moments he would maintain a strictly professional relationship and other times he would interact with Ms. Zoe as if they were lovers, using their therapy sessions to talk about personal things.

146. The sexual contact was entirely when and how Dr. Quick wanted it, without any discussion beforehand or knowledge from Ms. Zoe about whether it would occur.

147. The inconsistent behavior exhibited by Dr. Quick exacerbated Ms. Zoe's symptoms and were clearly contraindicative for someone with her mental health diagnoses.

148. Dr. Quick was well aware that his inconsistent behavior that took advantage of Ms. Zoe's vulnerabilities was antithetical to the therapeutic methods she needed.

149. As a direct result of the abuse, Ms. Zoe began having difficulty eating again.

150. She felt used and discarded, and entirely at Dr. Quick's mercy.

[4852288.12]

151.    Throughout 2022 and 2023, several nurses and officers, names currently unknown to Plaintiff, found Dr. Quick alone in Ms. Zoe's cell during count time sitting less than an arm's length distance, and would find the two of them alone in the conference room together during count time.

152.    Additionally, officers would have been able to see Dr. Quick entering Ms. Zoe's cell by himself and remaining alone in her cell.

153.    This should have given officers notice that inappropriate conduct was occurring. Still, no staff member made a report or investigation.

154.    Given the overtness and frequency with which Dr. Quick preyed on Ms. Zoe, other BOP personnel suspected or should have suspected that he was sexually abusing her.

155.    Binding PREA regulations mandate staff reporting, where all BOP staff are required to "report immediately . . . **any knowledge, suspicion, or information** regarding an incident of sexual abuse or sexual harassment that occurred in a facility. . .; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." 28 C.F.R. § 115.61(a) (emphasis added).

156.    When an incarcerated person is subject to a substantial risk of imminent sexual abuse, BOP shall take immediate action to protect that person. *See* 28 C.F.R. § 115.62. In addition, administrative investigations of alleged sexual abuse by a staff member are required to proceed "promptly, thoroughly, and objectively for all allegations, including third-party and anonymous reports." *Id.* § 115.71(a). The presumptive disciplinary sanction for substantiated allegations of sexual abuse is termination. *See id.* § 115.76(b). Victims shall also be offered medical and mental health care by the BOP. *See id.* § 115.83.

24

[4852288.12]

157. Defendant United States and its agents, servants, contractors, and employees had numerous opportunities to follow the above-mentioned mandates and stop Dr. Quick's misconduct. Dr. Quick's actions, including treating her in her cell, were abnormal, obvious, and suspicious for sexual misconduct. In addition, upon information and belief, correctional officers in the control room were charged with monitoring the security cameras and following up on any suspicious activities that they noticed on the cameras. These officers saw or should have seen that Dr. Quick frequently disappeared into unmonitored areas with incarcerated persons who were not authorized to be in those areas alone with an officer. Nevertheless, BOP personnel took no actions to investigate or stop this suspicious and recurrent behavior.

158. Defendants and its agents, servants, contractors, and employees failed to investigate, discipline, supervise, monitor, question, or stop Dr. Quick despite numerous indications of sexual misconduct. This was in direct violation of mandatory BOP policies, was not related to a discretionary function or duty, and served no plausible penological policy purpose.

159. Defendants and their agents, servants, contractors, and employees had actual and constructive notice that Ms. Zoe's cell could be used as a site of sexual abuse. Nevertheless, no BOP personnel came to investigate, intervene, or inquire as to Dr. Quick's interactions with Ms. Zoe. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

160. After Ms. Zoe came forward about the sexual abuse by Dr. Quick in December 2023 by reporting to the DOJ on the computer, she was interviewed by FMC Carswell staff about the sexual abuse on January 5, 2024.

[4852288.12]

161. Following her reporting, Dr. Quick was placed on administrative leave but was subsequently reinstated and returned to the facility in November 2024.

162. Ms. Zoe again wrote to BOP staff on November 17, 2024, requesting them to further investigate Dr. Quick after his return.

163. Following this report of Dr. Quick, FMC Carswell staff also began retaliating against Plaintiff.

164. By February 14, 2024, Ms. Zoe was charged with disciplinary charges and put in the medical SHU for three months, having had no significant prior disciplinaries.

165. These disciplinary charges were later dismissed.

166. In her cell in the medical SHU, there were glass windows where officers would have full sight of Ms. Zoe.

167. As a result, Ms. Zoe was unable to eat since she was not afforded the privacy she needed to do so and due to her mental health conditions, she is unable to eat in view of others.

168. Additionally, placement in SHU meant she could not get commissary food items that helped her maintain her sugar levels and which provided her necessary comfort.

169. Consequently, she had a relapse of severe anorexia.

170. She was taken to an outside medical hospital one month after her placement in the SHU due to severe malnutrition.

171. Despite her rapidly declining weight and relapse of severe anorexia from February 2024 until April 2024, FMC Carswell continued to house Ms. Zoe in the SHU without appropriate medical care.

172. Ms. Zoe was again placed in the SHU for a month on July 18, 2024 for a false positive on a urine analysis, despite having no history of drug use.

26

173. This disciplinary charge was later expunged.

174. While in the SHU, Ms. Zoe was visited by Chaplain Farooqi. These visits were reassuring to Ms. Zoe because she and Chaplain Farooqi shared similar social and cultural backgrounds and the two were able to communicate in similar languages. Chaplain Farooqi helped Ms. Zoe feel less alone.

175. On or around August 15, 2024, Ms. Zoe was removed from the SHU.

176. The following day, Ms. Zoe visited Chaplain Farooqi where the two continued discussing personal things. Again, Ms. Zoe felt like she had found someone who could understand her identity and cultural background.

177. The following day, Ms. Zoe again went to Chaplain Farooqi's office.

178. This time, however, he got up from the table in which he sat and approached Ms. Zoe. She thought he was going to walk by her. Instead, he physically grabbed her face, neck, and breasts, and pulled her towards him. He then kissed her mouth. Ms. Zoe's first thought was to acquiesce because she believed it was the only way he would assist her.

179. On August 18, 2024, Ms. Zoe attended the class Chaplain Farooqi led.

180. During this class, he stared at her the entire time and talked about sex.

181. Ms. Zoe again felt used, violated, and unprotected by Defendants whose job it was to ensure her safety and protection.

182. When Ms. Zoe was at her healthiest, she was able to get her weight into the 90s, which was still under the ideal weight for someone of her size.

183. As a result of the current stress, anxiety, and trauma caused by Dr. Quick and BOP's failure to protect her, Ms. Zoe last weighed in on April 3, 2025, weighing under 80 pounds.

[4852288.12]

184. Defendants' acts caused Plaintiff severe mental, physical, and emotional harm and exacerbated all of her already underlying mental health diagnoses.

185. Ms. Zoe has had numerous anorexia relapses.

186. She continues to battle anorexia, depression, chronic anxiety, severe retaliation, and has continued mistrust of all BOP staff. All of her previously underlying mental health diagnoses have been greatly exacerbated. She continues to suffer from debilitating psychological trauma; permanent and catastrophic psychological injuries; severe emotional distress; permanent physical ailments associated with psychological injuries; pain; humiliation; loss of enjoyment of life; and loss of quality of life.

187. The foregoing are permanent injuries as a direct result of Defendants' deliberate indifference to Plaintiff's health and safety, Defendants' disregard of the excessive risk of harm to Plaintiff's health and safety, and/or Defendants' negligent failure to promptly protect Plaintiff from foreseeable assaults. Plaintiff also suffers from other permanent injuries and deficits that will be established through expert consultation in this litigation.

188. Upon information and belief, Plaintiff will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Plaintiff's injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning.

**ONGOING LACK OF MEDICAL TREATMENT AND RETALIATION**

189. Since reporting Dr. Quick's abuse, FMC Carswell has not provided Plaintiff with adequate medical or mental health care. She also continues to experience retaliation for reporting staff abuse.

[4852288.12]

190. Despite her serious Anorexia Nervosa, FMC Carswell has refused to provide Ms. Zoe adequate treatment, despite the high risk for serious medical consequences, which include death.

191. Since May 2025, Plaintiff's weight has hovered around 75 pounds and has dipped below 75 pounds at times.

192. Plaintiff's weight is dangerously low.

193. Plaintiff has also been suffering from retaliation for reporting Dr. Quick's and other medical staff's abuse.

194. On April 26, 2025, Nurse Reyes entered Plaintiff's room to take her vitals. After taking her vitals, he told her he was going to conduct her weekly medical assessment.

195. At the time, she was in the hospital unit, where she received weekly assessments because of her severe anorexia.

196. She previously had an assessment on April 21, so she was not due for one, but she did not think anything of it at the time.

197. She later had a weekly assessment on April 29, which made Plaintiff realize that the April 26 assessment was likely unscheduled.

198. Usually, Ms. Zoe's assessments began by medical staff listening to her heart and lungs.

199. This time, Nurse Reyes began with an abdomen palpation with Plaintiff laying down, starting at the top of her abdomen. His hands started going lower on her abdomen for less than a minute until Plaintiff felt Nurse Reyes's finger inside of her vagina. She immediately sat up straight and yelled, "What are you doing? Please leave!"

29

[4852288.12]

200. Nurse Reyes told her he could stop the assessment but that it was all a part of the examination. Plaintiff again asked him to leave loudly enough for at least one other person on the unit to hear.

201. Nurse Reyes tried to leave quickly, and in doing so, accidentally pushed the blood pressure monitor into the back of Plaintiff's right leg near her knee, leaving a bruise the size of a golf ball.

202. A lieutenant took a photo of the bruise Nurse Reyes left about two weeks later.

203. Later that day, an inmate nursing assistant told Ms. Zoe that Nurse Reyes told her not to give Ms. Zoe her double portion of food and fruits, something she was used to getting due to her anorexia.

204. After this assault, she experienced retaliation from the other nurses, which also impacted her medical care.

205. From around April 26, 2025 to September 26, 2025, she received 10 incident reports, and nine were written by nurses.

206. On May 23, 2025, Plaintiff's treatment team also placed her on a unit restriction.

207. Unit restriction is a punitive custody measure ordinarily reserved for people who have been found guilty of an incident report.

208. However, for Plaintiff, her unit restriction was the result of her alleged non-compliance with medical treatment.

209. Her treatment team told her that she would be taken off unit restriction if she ate.

210. Her unit restriction allowed her only one hour a day outside, and only if an inmate nursing assistant (INA) was willing to accompany her.

30

211.    Plaintiff alleges that the unit restriction was retaliatory, because many incarcerated people in the inpatient unit of FMC Carswell, a medical facility, refused medical treatment.  However, they were not placed on unit restriction.

212.    When she asked the Warden why she was on unit restriction, the Warden told her to talk to her primary doctor, Dr. Miller.

213.    When she asked Dr. Miller, he told her that he did not place her on unit restriction.

214.    Plaintiff remained on unit restriction for about five months.

215.    Plaintiff is permitted to receive an extra blanket because her low body weight means that she gets cold easily.

216.    In October 2025, Dr. Miller ordered that her extra blanket be removed.

217.    That month, Dr. Miller and other BOP staff, also moved Plaintiff out of a single cell, where she had been since May 2023, and placed her in a room with a cellmate.

218.    On November 20, 2025, around eight in the morning, Dr. Miller came to Plaintiff's cell alone.  Because of Ms. Zoe's prior PREA reports, no medical staff member was supposed to come to her cell alone, and this was the first time Dr. Miller came to her cell alone.

219.    Plaintiff's roommate was in the restroom, though she would normally be in classes at this time, a fact that Dr. Miller likely knew.

220.    He approached Plaintiff and asked her why she was refusing his medical advice, and Plaintiff responded that she was allowed to refuse treatment.  She was upset because she was told that as long as she maintained a body weight of 75 pounds, she could remain in a single cell.  However, she had done so, and staff still moved her to a room with another person.

31

221. Dr. Miller then grabbed her hair and called her a "dumb bitch." He ordered her to comply with his requests, which included "sucking my dick, like this." He then proceeded to suck Plaintiff's lip, grabbed her hand, and placed it on the outside of his pants on his genitals.

222. In that moment, Plaintiff's roommate flushed the toilet, and Dr. Miller pushed her away. He told her if she did anything, which she interpreted as reporting the assault, she would go directly to the SHU.

223. That very same day, on November 20, 2025, Plaintiff was placed in the SHU before she had reported the assault.

224. She wrote to OIG two days later to report the abuse.

225. Plaintiff was placed in the medical SHU under the guise of medical observation. Despite not receiving a disciplinary report, Plaintiff was placed in this highly restrictive, punitive setting.

226. Plaintiff had begun refusing weight and vitals after she was placed in a room with another cellmate. This greatly exacerbated her anorexia and ASD, in clinical contradiction to her serious medical needs.

227. However, no medical staff member attempted to treat the issue clinically, given that a well-known feature of anorexia is the resistance to treatment.

228. Plaintiff's SHU placement made it even more difficult for her to eat.

229. On December 17, 2025, Assistant Warden of Medical, Philips, told Plaintiff that she would be moved out of the SHU the next day.

230. However, she later found out that Dr. Miller refused to release her from the SHU.

231. Plaintiff met with a clinician who was in training to be an eating disorder dietitian once in December 2025.

[4852288.12]

232. The dietician recommended that Plaintiff be provided the foods that help her eat, as described above. She also recommended that Plaintiff be provided with cottage cheese three times a day.

233. FMC Carswell rejected the recommendations of the dietician and provided her only with four ounces of cottage cheese in the morning.

234. When Plaintiff asked the kitchen supervisor why in the past he was able to order recommended food items for her, but he could not now, he said, "ask your doctor."

235. When Plaintiff asked her doctor at the time, Dr. Miller, he simply told her it was a team decision.

236. In January 2026, Plaintiff was released from the medical SHU.

237. Because of Plaintiff's ASD, she is very particular about what food she eats. Plaintiff consumes more food when she is able to acquire ginger, cilantro, mint, coconut water, yogurt, and lemon juice. She has also been, at times, provided a double portion of fruit.

238. After she reported Dr. Quick's abuse, as well as abuse by other doctors and nurses, Plaintiff has not been consistently provided with the foods she requests to help her maintain her weight.

239. BOP has never provided Ms. Zoe with consistent or substantial access to eating disorder-specific treatment. Plaintiff saw a mental health clinician once monthly for a few months.

240. She was specifically told by mental health staff that they would help her with coping skills and communication, but not with her eating disorder.

241. In fact, when she saw psychiatrist Dr. Field in August 2025, she specifically told her she is not here to treat her eating disorder.

[4852288.12]

242. Plaintiff repeatedly requested a different doctor, given Dr. Miller's abuse of Plaintiff and his failure to treat her eating disorder. On March 16, 2026, FMC Carswell's clinical director, Dr. Linden, decided to discharge Plaintiff from the hospital unit, even though nothing had changed about Ms. Zoe's medical condition.

243. Plaintiff had been placed in the hospital unit because of her weight and vitals, requiring her to be monitored.

244. Plaintiff had no treatment plan in place to discharge from the inpatient unit. Her eating had not improved, and she did not have her weight taken or her labs done before she was moved. FMC Carswell decided to cease monitoring a medically fragile patient, leaving her extremely vulnerable to organ failure and even death.

245. Plaintiff was discharged while Dr. Miller was away from the facility. She was discharged into a single cell in the general population unit.

246. However, when Dr. Miller returned one or two days later, he called Plaintiff's counselor and told her to move Plaintiff to a room with cellmates.

247. Plaintiff knows that it was Dr. Miller who ordered this move, because her counselor told her.

248. Now that she has been discharged from the hospital unit, the facility is no longer conducting weekly assessments.

249. They do not track her weight and are not treating her eating disorder.

250. BOP and FMC Carswell are deliberately indifferent to Plaintiff's serious medical needs.

251. She feels very weak and suspects that she is losing weight.

[4852288.12]

252.    This is exacerbated by her inability to eat properly in front of her roommates, a symptom of Plaintiff's ASD of which FMC Carswell is aware and has justified her placement in a single cell in the past.

253.    Despite discharging her to general population, BOP staff continue to threaten Plaintiff with placement in the medical SHU if she refuses food.

254.    When Plaintiff raises her concerns with staff she is ignored and retaliated against.

## CONDITIONS PRECEDENT TO THIS LAWSUIT

255.    Plaintiff has properly complied with the requirements of 28 U.S.C. § 2675 by presenting an Administrative Claim against the United States of America (*i.e.*, Claim No. TRT-SCR-2024-05085).  The Claim was timely filed with the BOP on March 31, 2024, within two years of the accrual of the causes of action.

256.    In her claim, Plaintiff alleged that Dr. Quick used his position as her provider to sexually assault her.  She also alleged that after reporting the sexual assault, she was sent to solitary housing under a trumped up disciplinary charge, which she believed to be retaliatory.

257.    BOP acknowledged receipt of the Administrative Claim in a letter dated May 20, 2024, but Plaintiff has not received a further response from BOP disposing of this Claim to date. Under 28 U.S.C. § 2675(a), BOP's failure "to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim."  In addition, under 28 C.F.R. § 14.2(c), when a pending claim is amended, BOP "shall have six months in which to make a final disposition of the claim as amended."  By the filing of this action, Plaintiff elects to deem BOP's lack of response within six months of the amendment of the Claim as the final denial of Plaintiff's Administrative Claim in its entirety. Therefore, Plaintiff exhausted requisite administrative remedies.

[4852288.12]

## CAUSES OF ACTION

### COUNT I – NEGLIGENCE UNDER FEDERAL TORT CLAIMS ACT
### (AGAINST DEFENDANT UNITED STATES OF AMERICA)

258.    Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth herein.

259.    At all relevant times, Defendant United States, individually or through its agents, servants, contractors, and/or employees undertook and endeavored to, and did provide custodial care to people incarcerated at FMC Carswell including but not limited to the Plaintiff.

260.    At all relevant times, Defendant United States acted negligently in its indifference to Plaintiff's safety.

261.    At all relevant times, Defendant United States hired correctional and administrative employees at FMC Carswell, including Dr. Quick and Chaplain Farooqi, as well as colleagues and supervisors of Dr. Quick whose identity are currently unknown to Plaintiff.

262.    At all relevant times, these personnel were all federal employees and were acting within the scope of their employment with the United States, in their official uniforms during work hours, performing work duties, when exercising custodial care, control, and supervision to Plaintiff.

263.    At all relevant times, FMC Carswell personnel held themselves out to incarcerated individuals as personnel with the ability and knowledge to carry out their duties, provide due care, and to act in accordance with standards of reasonable care common and acceptable in the community.

264.    At all relevant times and within the scope of their employment by Defendant United States, the above-named and unknown staff, while working within their official capacities at FMC Carswell, owed a non-delegable duty of care to Plaintiff while she was at FMC Carswell.

36

[4852288.12]

265.    It is Defendant United States duty to maintain, operate, and control FMC Carswell as a safe and secure space for persons in it, including but not limited to Plaintiff.

266.    In addition to a custodial duty owed to Plaintiff, Defendant United States of America was statutorily obligated under the Prison Rape Elimination Act and BOP policy to protect incarcerated people from foreseeable harm that included the sexual abuse suffered by Ms. Zoe.

267.    Defendant United States should have known that Dr. Quick had a propensity to sexually abuse inmates.

268.    Defendant United States should have known that Dr. Quick acted inappropriately with incarcerated persons under his care at FMC Carswell.

269.    Defendant United States was on notice of the possibility that incarcerated persons would be sexually abused by corrections officers and other facility staff, through above-mentioned investigations, articles, lawsuits, and reports.

270.    As such, there was a foreseeable risk that correctional officers and other staff would sexually abuse Plaintiff and others under their control.

271.    Despite actual and constructive notice of Dr. Quick's abuse, agents, servants, contractors, and/or employees of Defendant United States did not exercise reasonable care or take reasonable available measures to abate the risk of sexual abuse to Plaintiff, and to ensure their safety, in violation of federal regulations and BOP protocols.

272.    Despite actual and constructive notice of Dr. Quick's abuse, Defendant United States failed to create and implement procedures, training, and supervision that would protect incarcerated persons from the foreseeable risk of harm, including sexual abuse.

[4852288.12]

273.    Despite actual and constructive notice of Dr. Quick's abuse, Defendant United States failed to adequately monitor and supervise employees, such as Dr. Quick, while employees were acting within the scope of their employment.

274.    Despite actual and constructive notice of Dr. Quick's abuse, Defendant United States knew of or should have known of the risk posed to Plaintiff and other incarcerated persons that they would be sexually assaulted by employees such as Dr. Quick.

275.    Despite actual and constructive notice of Dr. Quick's abuse, Defendant United States failed to maintain its facilities in a manner to deter the possibility of sexual abuse, including the above-mentioned lack of video cameras and the availability of unmonitored and isolated spaces in the facility.

276.    Due to Defendant United States's herein described acts and omissions, it breached its duty to protect Plaintiff and other incarcerated persons from the reasonably foreseeable harm of sexual abuse by its employees.

277.    Even though the United States' hiring, retention, and promotion of its employees are sometimes considered discretionary, when, as here, the United States was aware of its employees' tortious conduct, ignored and assisted in it, its retention of those employees does not represent a choice based on legitimate policy considerations.

278.    Agents, servants, contractors, and/or employees of the United States did not possess the necessary skill to maintain a safe and secure environment and protect Plaintiff from foreseeable harm.

279.    Agents, servants, contractors, and/or employees of the United States neglected to apply the skill they did have.

38

[4852288.12]

280.   Agents, servants, contractors, and/or employees of the United States did not use reasonable care in applying the skill they had.

281.   Agents, servants, contractors, and/or employees of the United States mistreated Plaintiff and/or were negligent in other ways that are documented in the relevant records and/or in ways of which Plaintiff are not yet aware.

282.   Plaintiff's injuries were inflicted solely through the carelessness, recklessness, gross negligence, negligence, and deliberate indifference of Defendant United States and its agents, servants, contractors, and/or employees, and through no fault or want of care or contributory negligence on the part of Plaintiff.

283.   The failure of FMC Carswell personnel to prevent, investigate, or acknowledge Dr. Quick's or Chaplain Farooqi's sexual abuse served no legitimate policy purpose.  On the contrary, FMC Carswell staff were required by mandatory BOP policies and federal regulations to immediately intervene and investigate when they learned of his suspected sexual abuse.  Their failure to do so was patently outside of their discretionary function.

284.   Plaintiff's injuries were direct and proximate consequences of Defendant United States' (a) failure to enforce zero-tolerance policy against sexually abusive conduct, 28 C.F.R. § 115.11; (b) failure to supervise, monitor, and surveil one-on-one physical contact between BOP personnel and incarcerated persons, 28 C.F.R. § 115.13; (c) decision to hire, retain, and promote BOP personnel who was suspected or alleged to have had improper sexual contact, 28 C.F.R. § 115.17; (d) punishment of victims through disciplinary or retaliatory measures instead of providing proper support and protection, 28 C.F.R. § 115.43; (e) failure to report suspicion or allegation of sexual abuse, 28 C.F.R. § 115.61; (f) failure to protect victims from retaliation after reporting sexual abuse, 28 C.F.R. § 115.67; (g) failure to promptly, thoroughly, and objectively

39

investigate all allegations or reports, 28 C.F.R. § 115.71(a); and (h) failure to discipline staff for sexual misconduct, 28 C.F.R. § 115.76.

285.    The United States' negligence in administering FMC Carswell is a direct and proximate cause of Plaintiff's injuries, including psychological trauma, distress, anxiety, depression, loss of quality of life and dignity, as well as medical and economic injuries.

**COUNT II – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM
UNDER FEDERAL TORT CLAIMS ACT
(AGAINST DEFENDANT UNITED STATES OF AMERICA)**

286.    Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

287.    A person is liable for intentional infliction of emotional distress if the plaintiff can show: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff's emotional distress; and (4) the resulting emotional distress was severe.  *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003).

288.    Defendant United States acts and omissions herein and the acts and omissions of its agents, servants, contractors, and/or employees constituted extreme and outrageous conduct, which caused Ms. Zoe's severe emotional distress following her sexual abuse.

289.    Defendant United States, individually or through its agents, servants, contractors, and/or employees intended to cause, or were recklessly indifferent to the probability of causing, Plaintiff severe emotional distress.

290.    Plaintiff, in fact, suffered debilitating emotional suffering.  Her emotional distress was so substantial and enduring that no reasonable person in a civilized society should be expected to endure it.

40

[4852288.12]

291.    Dr. Quick and Chaplain Farooqi engaged in extreme and outrageous conduct through sexually assaulting Ms. Zoe while she was incarcerated under their care.  Both abused their authority and power to cause her severe emotional distress, or was recklessly indifferent to the probability of causing such distress, when they sexually abused her while they were supposed to be providing medical care and religious support, respectively.

292.    As Ms. Zoe's therapist, Dr. Quick knew of Ms. Zoe's mental health diagnoses, as well as her triggers, and needs for regulation.  His abuse of his power in clear violation of his responsibilities as a BOP employee as well as his ethical responsibilities as a licensed therapist, further exhibits extreme and outrageous conduct.

293.    Chaplain Farooqi also had reason to know of Plaintiff's vulnerabilities as her religious counselor.

294.    At all relevant times, Dr. Quick and Chaplain Farooqi were acting within the scope of their employment at FMC Carswell, and used their authority as members of the facility's medical and religious staff, respectively, to sexually assault Plaintiff, while Plaintiff did not have the ability to consent or withhold consent.

295.    Plaintiff's injuries and damages were caused, in whole or in part, by intentional torts (*e.g.*, intentional infliction of emotional distress, gender violence, sexual assault, and battery) perpetrated by Dr. Quick and Chaplain Farooqi.  Under 28 U.S.C. § 2680(h), Defendant United States is liable for the intentional torts committed by Dr. Quick and Chaplain Farooqi, and their abuse of their position of authority as a prison therapist and religious counselor, respectively, within the scope of his employment and under color of federal law.

296.    At all relevant times, Defendants United States individually or through its agents, servants, contractors, and/or employees including Dr. Quick and Chaplain Farooqi, were acting

41

under color of authority as "law enforcement officers" within the meaning of 28 U.S.C. § 2680(h).  At all relevant times, Dr. Quick and Chaplain Farooqi supervised, disciplined, oversaw, monitored, controlled, directed, ordered, restrained, and imprisoned the Plaintiff within the scope and course of their employment with Defendant United States.  All BOP employees, including mental health staff are charged with maintaining security of the institution and staffs' correctional responsibilities precede all others required by this position and are performed on a regular and recurring basis.

297.    At all relevant times, Defendant United States individually or through its agents, servants, contractors, and/or employees including Dr. Quick and Chaplain Farooqi, used their authority as law enforcement officers to direct, order, restrain, force, overpower, intimidate, threaten, coerce, blackmail, harass, abuse, and assault the Plaintiff and to prevent her from disclosing the sexual assaults for fear of retaliation, victim-blaming or shaming, additional assaults, among others.

298.    Defendant United States is vicariously liable for the intentional torts committed upon the Plaintiff.  Therefore, Plaintiff brings this Claim for intentional infliction of emotional distress under the FTCA against the United States, based on the conduct of its officers including Dr. Quick.

299.    As a result of FMC Carswell personnel's use and abuse of their positions of authority as "law enforcement officers" within the course and scope of their employment, and as a direct and proximate result of the foregoing, Plaintiff suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of

[4852288.12]

quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

300.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

## COUNT III – SEXUAL BATTERY UNDER FEDERAL TORT CLAIMS ACT
### (AGAINST DEFENDANT UNITED STATES OF AMERICA)

301.    Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

302.    A person is liable for battery if that person:

- intentionally, knowingly, or recklessly causes bodily injury to another; or

- intentionally or knowingly causes physical contact with another when he or she knows or should reasonably believe that the other will regard the contact as offensive or provocative.

303.    Dr. Quick committed sexual battery on Ms. Zoe.  It was impossible for Ms. Zoe to provide consent under 18 U.S.C. § 2243(b), which constitutes a felony when a BOP employee knowingly engages "in a sexual act with another person who is (1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging."

304.    Dr. Quick acted within the scope of his authority and employment as a federal employee in the medical unit at FMC Carswell.

305.    Ms. Zoe reasonably believed that Dr. Quick was in a position of control or authority, and she did not have the ability to consent or not consent to sexual acts that he initiated.

[4852288.12]

306. With the intent to cause offensive or provocative contact, Dr. Quick subjected Ms. Zoe to sexual acts to which she could not consent. These acts were deeply offensive to her personal dignity and would offend a person of ordinary sensitivity. Dr. Quick intentionally, knowingly, and recklessly caused bodily injury to Ms. Zoe when he sexually assaulted her.

307. Chaplain Farooqi committed sexual battery on Ms. Zoe. It was impossible for Ms. Zoe to provide consent under 18 U.S.C. § 2243(b), which constitutes a felony when a BOP employee knowingly engages "in a sexual act with another person who is (1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging."

308. Chaplain Farooqi acted within the scope of his authority and employment as a federal employee in the medical unit at FMC Carswell.

309. Ms. Zoe reasonably believed that Chaplain Farooqi was in a position of control or authority, and she did not have the ability to consent or not consent to sexual acts that he initiated.

310. With the intent to cause offensive or provocative contact, Chaplain Farooqi subjected Ms. Zoe to sexual acts to which she could not consent. These acts were deeply offensive to her personal dignity and would offend a person of ordinary sensitivity. Chaplain Farooqi intentionally, knowingly, and recklessly caused bodily injury to Ms. Zoe when he sexually assaulted her.

311. As a direct and proximate result of the foregoing, Plaintiff suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of

44

life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

312.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

313.    Defendant United States of America is liable for the intentional torts committed by Dr. Quick and Chaplain Farooqi, and his abuse of his position of authority as a correctional officer within the scope of his employment.

### COUNT IV – SEXUAL ASSAULT UNDER FEDERAL TORT CLAIMS ACT
### (AGAINST DEFENDANT UNITED STATES OF AMERICA)

314.    Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

315.    Plaintiff brings this Claim under the FTCA for sexual assault against Defendant United States of America, based on the conduct of its officers including Dr. Quick.

316.    A person is liable for assault if that person intentionally or knowingly threatens another with imminent bodily injury.  A threat may be by conduct or by words.

317.    Dr. Quick intentionally, knowingly, or recklessly threatened Ms. Zoe with bodily injury when he repeatedly assaulted her.

318.    Dr. Quick subjected Plaintiff to sexual acts with the intent to cause offensive or provocative contact.  His intentional torts caused Ms. Zoe's physical and emotional injuries, and Defendant United States of America is liable for intentional torts perpetrated by its agents within the scope of their employment.

[4852288.12]

319.    It was impossible for Ms. Zoe to provide consent under 18 U.S.C. § 2243(b), which constitutes a felony when a BOP employee knowingly engages "in a sexual act with another person who is (1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging."

320.    Dr. Quick acted within the scope of his authority and employment as a federal employee in the medical unit at FMC Carswell.

321.    Ms. Zoe reasonably believed that Dr. Quick was in a position of control or authority, and that she did not have the ability to consent or not consent to sexual acts that he initiated.

322.    Chaplain Farooqi intentionally, knowingly, or recklessly threatened Ms. Zoe with bodily injury when he groped and kissed her.

323.    Chaplain Farooqi subjected Plaintiff to sexual acts with the intent to cause offensive or provocative contact.  His intentional torts caused Ms. Zoe's physical and emotional injuries, and Defendant United States of America is liable for intentional torts perpetrated by its agents within the scope of their employment.

324.    It was impossible for Ms. Zoe to provide consent under 18 U.S.C. § 2243(b), which constitutes a felony when a BOP employee knowingly engages "in a sexual act with another person who is (1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging."

325.    Chaplain Farooqi acted within the scope of his authority and employment as a federal employee in the medical unit at FMC Carswell.

46

[4852288.12]

326.    Ms. Zoe reasonably believed that Chaplain Farooqi was in a position of control or authority, and that she did not have the ability to consent or not consent to sexual acts that he initiated.

327.    As a direct and proximate result of the foregoing, Plaintiff suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

328.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

329.    Defendant United States of America is liable for the intentional torts committed by Dr. Quick and Chaplain Farooqi, and their abuse of their positions of authority as correctional officers within the scope of their employment.

**COUNT V – NEGLIGENT SUPERVISION UNDER FEDERAL TORT CLAIMS ACT**
**(AGAINST DEFENDANT UNITED STATES OF AMERICA)**

330.    Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

331.    An employer is liable for negligent hiring, supervision, or retention if the employer owed a legal duty to protect Plaintiff from the employee's actions and the Plaintiff

47

sustained damages proximately caused by the employer's breach of that legal duty. *See Moore Freight Services, Inc. v. Munoz*, 545 S.W. 3d 85, 98 (Tex. Appl. 2017).

332. Defendant United States of America hired Dr. Quick, Chaplain Farooqi, and other abusive employees, and allowed them to use their positions of power within the facility to exert influence over incarcerated persons such as Ms. Zoe.

333. Defendant United States knew that potential abusers such as Dr. Quick and Chaplain Farooqi would have the opportunity to be alone with female incarcerated persons, particularly in secluded areas and areas without other facility personnel or video surveillance.

334. Defendant United States failed to properly oversee and administer FMC Carswell, and failed to properly implement BOP and PREA policies that would have deterred sexual abuse such as that suffered by Ms. Zoe.

335. Defendant United States had knowledge of the threat of future sexual abuse posed to incarcerated persons as committed by facility staff, through the above-mentioned reports and lawsuits.

336. Defendant United States's knowledge of prior sexual abuse at FMC Carswell placed it on notice of employees' propensity to engage in sexually abusive behavior with incarcerated persons such as Ms. Zoe.

337. If Defendant United States had properly supervised employees, facility staff such as Dr. Quick and Chaplain Farooqi would not have been able to sexually abuse incarcerated people.

338. If Defendant United States had conducted thorough investigations of reported employees, Dr. Quick and Chaplain Farooqi would not have been able to continue sexually abusing incarcerated people, including Ms. Zoe.

48

[4852288.12]

339.    Defendant United States was also negligent in allowing employees it knew previously committed sexual abuse to continue to safeguard and monitor a female population of incarcerated people.

340.    If Defendant United States had properly supervised and investigated employees such as Dr. Quick and his supervisors, it would have learned of his propensity to commit sexual abuse.

341.    Defendant United States's above-described acts and omissions were a direct and proximate cause of Plaintiff's serious physical and emotional harm.

## COUNT VI – SEXUAL ASSAULT & BATTERY UNDER TEXAS COMMON LAW (AGAINST DEFENDANT QUICK)

342.    Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

343.    A person is liable for assault and battery if that person:

- intentionally, knowingly, or recklessly causes bodily injury to another;

- intentionally or knowingly threatens another with imminent bodily injury; or

- intentionally or knowingly causes physical contact with another when he or she knows or should reasonably believe that the other will regard the contact as offensive or provocative.

344.    Dr. Quick committed sexual battery and assault on Ms. Zoe.  It was impossible for Ms. Zoe to provide consent under 18 U.S.C. § 2243(b), which constitutes a felony when a BOP employee knowingly engages "in a sexual act with another person who is (1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging."

345.    Dr. Quick acted within the scope of his authority and employment as a federal employee in the medical unit at FMC Carswell.

49

[4852288.12]

346.     Ms. Zoe reasonably believed that Dr. Quick was in a position of control or authority, and she did not have the ability to consent or not consent to sexual acts that he initiated.

347.     With the intent to cause offensive or provocative contact, Dr. Quick subjected Ms. Zoe to sexual acts to which she could not consent.  These acts were deeply offensive to her personal dignity and would offend a person of ordinary sensitivity. Dr. Quick intentionally, knowingly, and recklessly caused bodily injury to Ms. Zoe when he sexually assaulted her.

348.     As a direct and proximate result of the foregoing, Plaintiff suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

349.     As a direct and proximate result of Defendant's conduct, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

## COUNT VII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM
### UNDER TEXAS COMMON LAW
### (AGAINST DEFENDANT QUICK)

350.     Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

351.     A person is liable for intentional infliction of emotional distress if the plaintiff can show: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was

50

[4852288.12]

extreme and outrageous; (3) the defendant's actions caused the plaintiff's emotional distress; and (4) the resulting emotional distress was severe. *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003).

352.   Defendant Quick intended to cause, or were recklessly indifferent to the probability of causing, Plaintiff severe emotional distress.

353.   Plaintiff, in fact, suffered debilitating emotional suffering.  Her emotional distress was so substantial and enduring that no reasonable person in a civilized society should be expected to endure it.

354.   Dr. Quick engaged in extreme and outrageous conduct through sexually assaulting Ms. Zoe while she was incarcerated, and being medically treated, under his care.  He abused his authority and power to cause her severe emotional distress, or was recklessly indifferent to the probability of causing such distress, when he sexually abused her while he was supposed to be providing medical care.

355.   As Ms. Zoe's therapist, Dr. Quick knew of Ms. Zoe's mental health diagnoses, as well as her triggers, and needs for regulation.  His abuse of his power in clear violation of his responsibilities as a BOP employee as well as his ethical responsibilities as a licensed therapist, further exhibits extreme and outrageous conduct.

356.   At all relevant times, Dr. Quick was acting within the scope of his employment at FMC Carswell, and used his authority as a member of the facility's medical staff, to sexually assault Plaintiff, while Plaintiff did not have the ability to consent or withhold consent.

357.   As a direct and proximate result of Defendant's conduct, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial,

51

and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

### COUNT VIII – NEGLIGENT SUPERVISION UNDER TEXAS COMMON LAW (AGAINST DEFENDANT RULE)

358.   Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

359.   An employer is liable for negligent hiring, supervision, or retention if the employer owed a legal duty to protect Plaintiff from the employee's actions and the Plaintiff sustained damages proximately caused by the employer's breach of that legal duty.  *See Moore Freight Services, Inc. v. Munoz*, 545 S.W. 3d 85, 98 (Tex. Appl. 2017).

360.   Defendant knew that potential abusers such as Dr. Quick and Chaplain Farooqi would have the opportunity to be alone with female incarcerated persons, particularly in secluded areas and areas without other facility personnel or video surveillance.

361.   Defendant failed to properly oversee and administer FMC Carswell and the hospital unit, and failed to properly implement BOP and PREA policies that would have deterred sexual abuse such as that suffered by Ms. Zoe.

362.   Defendant had knowledge of the threat of future sexual abuse posed to incarcerated persons as committed by facility staff, through the above-mentioned reports and lawsuits.

363.   Defendant hired, supervised, and/or retained Defendant Quick and allowed him to use his position of power as a BOP employee within the facility to exert influence over incarcerated persons such as Ms. Zoe.

364.   Defendant knew, or should have known, had they exercised reasonable care, that Defendant Quick was an unfit BOP employee prior to Plaintiff Zoe's sexual assault.

52

365.    There was sufficient evidence that Defendant Quick was being inappropriate with Plaintiff, which should have resulted in Defendant investigating and terminating Defendant Quick.

366.    Even if Defendant, as the warden of FMC Carswell, did not have actual knowledge that Defendant Quick had inappropriate relations with Plaintiff, it would have been obvious had Defendant exercised reasonable care and reasonably performed their job duties.

367.    Yet, Defendant continued to employ Defendant Quick and allowed him to have individual therapy sessions with Plaintiff alone in her room.

368.    By continuing to employ Defendant Quick, Defendant put Plaintiff, and all other incarcerated persons at FMC Carswell, at an unreasonable risk of harm.

369.    If Defendant had conducted thorough investigations of reported employees, Defendant Quick would not have been able to continue sexually abusing Ms. Zoe.

370.    Defendant's above-described acts and omissions were a direct and proximate cause of Plaintiff's serious physical and emotional harm.

**COUNT IX - TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT ("TVPA"),**
**18 U.S.C. § 1581, *ET SEQ.***
**(AGAINST DEFENDANT QUICK)**

371.    Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

372.    Congress passed the Trafficking Victims Protection Act and subsequent reauthorization acts ("TVPA") to combat domestic human trafficking.

373.    TVPA is a comprehensive statutory framework imposing both criminal and civil liability, *see* 18 U.S.C. § 1595, of persons engaging or attempting to engage or benefit from sexual exploitation and labor trafficking or obstructing anti-trafficking enforcement.

53

[4852288.12]

374. Specifically, the TVPA punishes anyone who attempts to, conspires to, or actively "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or . . . benefits, financially or by receiving anything of value, from participation in a [trafficking] venture" while knowing "that means of force, threats of force, fraud, coercion . . . will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a); 18 U.S.C. § 1594.

375. "Coercion" means "threats of serious harm to or physical restraint against any person . . . any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person" or "the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2).

376. "Serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." 18 U.S.C. § 1591(e)(5).

377. The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action. 18 U.S.C. § 1591(e)(1).

378. A commercial sex act is "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

54

379.    Additionally, the TVPA punishes anyone who "knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means.

a.    by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

b.    by means of serious harm or threats of serious harm to that person or another person;

c.    by means of the abuse or threatened abuse of law or legal process; or

d.    by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."  18 U.S.C. § 1589(a).

380.    The TVPA punishes anyone who knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d). 18 U.S.C. § 1589(b).

381.    The term "abuse or threatened abuse of law or legal process" in the forced labor provision means "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action."  18 U.S.C. § 1589(c)(1).

382.    The term "serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the

[4852288.12]

surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(12).

383.    The TVPA also punishes anyone who "obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section," 18 U.S.C. § 1591(d).

384.    The TVPA allows for civil liability as set forth in 18 U.S.C. § 1595(a).

385.    An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees. 18 U.S.C. § 1595(a).

386.    Congress grants a plaintiff up to ten years in which to bring a civil action under 18 U.S.C. § 1595(c). Dr. Quick made Plaintiff engage in sex acts through force and coercion.

387.    As Plaintiff's psychologist, Dr. Quick also used his position to coerce her into engaging in sex acts. His methods were designed to make Plaintiff believe she would suffer serious harm should she not obey his sexual advances.

388.    These tactics are part of a well-known scheme, plan, or pattern at FMC Carswell by a network of officers that were intended to cause a person to believe that failure to perform an act would result in serious harm or physical restraint.

389.    Defendant Quick exchanged valuable goods and special benefits, such as psychological support and treatment and single cell status, for these sex acts. In this way, Defendant Quick's conduct constitutes an attempt to engage in sex in exchange for things of value, the definition of commerciality under 18 U.S.C. § 1591.

56

[4852288.12]

390.    These acts constitute civil wrongs inflicted on Plaintiff and actionable under 18 U.S.C. § 1595.

391.    This conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm and she has a claim for damages for such violations under 18 U.S.C. § 1591, 18 U.S.C. § 1595.

392.    Defendant's conduct warrants the Court's imposition of compensatory and punitive damages against the Defendant.

393.    Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for the Defendant's wrongful conduct.

**COUNT X – EIGHTH AMENDMENT, CRUEL AND UNUSUAL PUNISHMENT, INJUNCTIVE RELIEF ONLY**
**(AGAINST DEFENDANT BOP AND ALL OFFICIAL CAPACITY DEFENDANTS)**

394.    Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

395.    Defendants have a non-delegable duty to ensure that the conditions of confinement in facilities operated by BOP employees and contractors are constitutionally adequate.

396.    Defendants failed to adequately monitor, oversee, and administer FMC Carswell and violated Plaintiff's rights to be free from cruel and unusual punishment by subjecting her to, or failing to prevent, sexual assault, intimidation, physical, sexual and verbal abuse, threats of violence, sexual harassment, retaliation, and other violations of law against Plaintiff, and by failing to investigate such violations, as set forth herein, subjected Plaintiff to unnecessary and wanton infliction of pain and physical injury and continue to subject Plaintiffs to a significant risk of serious harm.

57

[4852288.12]

397.    Additionally, in acting and failing to act as alleged herein, Defendants subject Plaintiff to unnecessary and wanton infliction of pain and injury and continue to subject Plaintiff to a significant risk of serious harm by failing to properly evaluate, train, discipline, and supervise custody personnel to prevent physical harm to, and/or sexual harassment of, incarcerated persons; by failing to investigate allegations of physical harm to and/or sexual harassment of incarcerated persons; and by failing to prevent retaliation against incarcerated persons for complaints of such abuse.

398.    Defendants also were, and continue to be, deliberately indifferent to Plaintiff's serious medical needs.  Plaintiff's medical needs are apparent and serious.  Plaintiff suffers from severe anorexia, which is deadly.  Her medical needs are exacerbated by her Autism Spectrum Disorder (ASD) diagnosis, which contributes to her anorexia.

399.    FMC Carswell and BOP were, and continue to be, aware of Plaintiff's serious medical needs and the substantial risk of harm that exists if she is not sufficiently treated.  By refusing to treat Plaintiff, ignoring her complaints, and intentionally treating her in ways that are clinically contraindicated, BOP and FMC Carswell have disregarded, and continue to, disregard the substantial risks.

400.    Defendants' failures, as described herein, and those of their agents, officials, employees, and all persons acting in concert with them, are the proximate cause of the Plaintiff's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

**COUNT XI – RETALIATION FOR EXERCISE OF FIRST AMENDMENT RIGHTS, INJUNCTIVE RELIEF ONLY**
**(AGAINST DEFENDANT BOP AND ALL OFFICIAL CAPACITY DEFENDANTS)**

401.    Plaintiff repeats and incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth above.

[4852288.12]

402.    Defendants have a non-delegable duty to ensure that the conditions of confinement in facilities operated by BOP employees and contractors are constitutionally adequate.

403.    In acting and failing to act as alleged herein, Defendants subjected Plaintiff to sexual assaults, abuse, and harassment, and/or failed to adequately investigate and take reasonable measures to protect Plaintiff, as described herein, in retaliation for Plaintiff's complaints to prison authorities regarding such unlawful conduct.

404.    Defendants have been and are aware of the retaliation complained of herein and have condoned or been deliberately indifferent to such conduct.

405.    Defendants' failures, as described herein, and those of their agents, officials, employees, and all persons acting in concert with them, and are the proximate cause of the Plaintiff's ongoing deprivation of rights secured by the United States Constitution under the First Amendment.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all claims so triable.

## PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.    An award of compensatory, punitive, and nominal damages to the Plaintiff in an amount to be determined at trial;

2.    An order enjoining Defendants, their agents, officials, employees, and all persons acting in concert from continuing the unlawful acts, conditions, and practices described in this Complaint;

3.    An order requiring Defendants to provide constitutionally adequate medical and mental health care to Plaintiff;

59

[4852288.12]

4.      An award to Plaintiff of the costs of this suit and reasonable attorneys' fees and litigation expenses; and

5.      For such other and further relief as this Court may deem just and proper.

Dated:  May 22,2026

Respectfully submitted,

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Texas Bar No. 24105721
SCOTT H. PALMER,
Texas Bar No. 00797196
BREANTA BOSS
Texas Bar No. 24115768
**PALMER PERLSTEIN**
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
james@palmerperlstein.com
scott@palmerperlstein.com
breanta@palmerperlstein.com
**LOCAL COUNSEL**
Deborah M. Golden
DC Bar # 470-578
*Application to N.D. Tex. forthcoming*
bex kolins
NC Bar # 58491
*N.D. Tex. admission pending*
**THE LAW OFFICE OF**
**DEBORAH M. GOLDEN**
700 Pennsylvania Ave. SE, 2nd Floor
Washington, DC 20003
202-630-0332
dgolden@debgoldenlaw.com

Kara J. Janssen (*pro hac vice*)
Luma Khabbaz (*pro hac vice*)
**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
(415) 433-6830
KJanssen@rbgg.com
LKhabbaz@rbgg.com

[4852288.12]